J-S33006-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYRONE WILBERT CLARK | : | |
| | : | |
| Appellant | : | No. 1412 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 5, 2022
In the Court of Common Pleas of Beaver County Criminal Division at
No(s):  CP-04-CR-0001651-2021

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED: December 29, 2023**

Appellant, Tyrone Wilbert Clark, appeals from the judgment of sentence of 25-50 years' incarceration, imposed after he was convicted of, *inter alia*, aggravated assault, 18 Pa.C.S. § 2702(a)(1).  We affirm.

We need not reproduce the factual and procedural history of this case, as the trial court comprehensively summarized it in its Pa.R.A.P. 1925(a) opinion.  ***See*** Trial Court Opinion ("TCO"), 1/30/23, at 1-42.  On appeal, Appellant raises the following questions for our review:

> I. Whether the trial court erred in permitting the Commonwealth to comment on … Appellant's retention of counsel prior to trial in violation of his rights under the Pennsylvania and United States Constitutions?
>
> II. Whether the trial court erred in permitting the Commonwealth to impermissibly suggest that … Appellant, and by extension, Appellant's counsel, had an obligation to assist law enforcement

---

[*] Former Justice specially assigned to the Superior Court.

in the investigation of the case in violation of his rights under the Pennsylvania and United States Constitutions?

III. Whether the trial court erred in denying … Appellant's motion *in limine* to introduce the prior *crimen falsi* convictions of the alleged victim under the premise that … Appellant did not provide written notice to the Commonwealth, where the Commonwealth acknowledged providing the criminal record of the alleged victim about a week prior to the trial and the Commonwealth suffered no prejudice from the lack of written notice and had a fair opportunity to contest the use of such evidence.

IV. Whether the trial court erred in denying … Appellant's motion *in limine* to introduce the prior *crimen falsi* convictions of the alleged victim and this error was because the probative value of allowing this evidence substantially outweighed its prejudicial effect.

Appellant's Brief at 3-4 (some italics removed).

## Issues 1 and 2

Appellant addresses his first and second issues together, so we do the same. He argues that the trial court erred in "permitting the Commonwealth to comment on … Appellant's retention of counsel prior to trial, and impermissibly suggest that … Appellant, and by extension, Appellant's counsel, had an obligation to assist law enforcement in the investigation of the case, in violation of his rights under the Pennsylvania and United States Constitutions." ***Id.*** at 30 (emphasis, unnecessary capitalization, and footnote omitted). No relief is due.

Initially, with respect to Appellant's claim that the Commonwealth improperly commented on Appellant's retention of counsel prior to trial, we deem this claim waived. In Appellant's Rule 1925(b) statement, he did not sufficiently identify when this allegedly improper comment occurred. ***See***

- 2 -

Appellant's Rule 1925(b) Statement, 12/21/22, at ¶ m ("The [c]ourt erred in permitting the Commonwealth to comment on [Appellant's] retention of counsel prior to trial in violation of his rights under the Pennsylvania and United States Constitutions."). As a result of Appellant's vagueness, the trial court stated that it would have to guess as to which comment by the Commonwealth Appellant intended to challenge and concluded that it could not meaningfully review this issue. *See* TCO at 64-66.

It is well-established that the Rule 1925(b) statement "shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii). Here, we agree that Appellant did not provide sufficient detail for the judge to identify the issue; thus, this issue is waived. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Trial Court Order, 11/30/22 (directing Appellant to file a Rule 1925(b) statement and warning that "any issue not properly included in the concise statement timely filed and served pursuant to subdivision (b) shall be deemed waived").

Nevertheless, even if this issue was not waived, and to the extent that Appellant also claims that the Commonwealth suggested that Appellant had an obligation to assist law enforcement, Appellant's argument lacks merit.[1]

---

[1] We note that, for questions of constitutional law, our scope of review is plenary, and our standard of review is *de novo*. ***See Commonwealth v. Edwards***, 272 A.3d 954, 963 (Pa. 2022).

Appellant's complaint centers on the questioning at trial of John Bialik, a police officer from the Borough of Ambridge. After reviewing the detailed and well-reasoned opinion issued by the Honorable Mitchell P. Shahen of the Court of Common Pleas of Beaver County, we conclude that Judge Shahen's opinion accurately and thoroughly disposes of why the Commonwealth's questioning of Officer Bialik was appropriate. TCO at 11-19, 66-70.[2] Accordingly, we adopt his opinion as our own with respect to this argument.

**Issues 3 and 4**

Appellant also combines his third and fourth issues into a single argument; thus, we likewise consider them together. Appellant argues that the trial court "erred in denying Appellant's motion *in limine* to admit impeachment evidence of a criminal conviction which involved dishonesty or false statement of the alleged victim." Appellant's Brief at 24 (emphasis modified, unnecessary capitalization and footnote omitted). Specifically, Appellant sought to introduce evidence that the victim had two convictions for theft by unlawful taking — one from 2003, and another from 2006. **See id.** at 15. At the time of trial, it was undisputed by the parties that the two

---

[2] Appellant seems to argue that any questioning by the Commonwealth that refers to Appellant's counsel is improper. **See** Appellant's Brief at 33 (arguing that "the questioning by the prosecutor referring to … Appellant's counsel or any counsel of Appellant was improper"). However, we agree with the Commonwealth's observation that the questions dealing with Officer Bialik's accessibility to defense attorneys who wish to offer him information about a case or seek clarification (including Appellant's counsel) was in direct response to Appellant's counsel's suggestion in his cross-examination that it was improper for Officer Bialik to not interview Appellant, who had invoked his right to remain silent. **See** Commonwealth's Brief at 19-20.

convictions, and the respective penalties imposed, ended more than ten years ago. N.T., 7/6/22, at 18.

Our Supreme Court has previously explained:

When reviewing the denial of a motion *in limine*, this Court applies an evidentiary abuse of discretion standard of review…. It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion. Thus, the Superior Court may reverse an evidentiary ruling only upon a showing that the trial court abused that discretion. A determination that a trial court abused its discretion in making an evidentiary ruling may not be made merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Further, discretion is abused when the law is either overridden or misapplied.

*Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014) (cleaned up).

Pennsylvania Rule of Evidence 609 provides, in relevant part:

**(a) In General.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.

**(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

(1) its probative value substantially outweighs its prejudicial effect; and

(2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Pa.R.E. 609(a), (b).

Further, this Court has directed that, in determining whether such evidence should be admitted, the following factors should be considered:

> 1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; 2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; 3) the age and circumstances of the defendant; 4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and 5) the existence of alternative means of attacking the defendant's credibility.

*Commonwealth v. Palo*, 24 A.3d 1050, 1056 (Pa. Super. 2011) (citations omitted).

Here, in discerning that the victim's convictions should not be admitted, the trial court explained:

> All right. Case No. 1946 of 2005, based on the documents that have been presented to the [c]ourt, contains a guilty plea that occurred on July 19, 2006, to Count 1 which was theft by unlawful taking as an M-2 with the factual allegations that can be ascertained from the exhibit being that a toolbox containing several tools belong to Steven Dean [was] unlawfully taken by the alleged victim in this case, William Brown.
>
> The facts at Case No. 3157[,] where the alleged victim was charged with and convicted of theft by unlawful taking and received a two-year probation sentence on 11/25/2003 are not evident on the exhibits.
>
> Under Rule 609, for the purposes of attacking the credibility of a witness, evidence that a witness has been convicted of a crime must be admitted if it involved dishonesty or false statement. The [c]ourt finds that these two convictions do involve dishonesty and/or false statements, dishonesty in particular.

However, under that same rule, if more than ten years have passed since the witness's conviction, and … that is the case, or released from confinement, whichever is later, evidence of the conviction is admissible only if the probative value substantially outweighs its prejudicial effect and the proponent in this case, [Appellant], gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

By virtue of the plea, the evidence in Case No. 1964 of 2005, I can say that … on the date of that plea, the alleged victim was 37 years old. That information is gleaned from the [g]uilty [p]lea [c]olloquy….

In this case, [Appellant], based upon our discussions yesterday, has available alternative means for attacking the witness's credibility and that, those alternative means consist of, among other things, different versions of the story, at least as were recounted to me by counsel last night.

In this case, this [c]ourt is also aware, based upon the discussions, that the Commonwealth contends that it has video, doorbell video, something like that[,] as well as a video of … the officer's body cam that would show allegedly [Appellant] in the area where the incident occurred.

There is no evidence indicating … that the alleged victim in this case from the time of 2006 to the current time has not or could not have been rehabilitated during that time, and there is no indication … of a history of other matters from the long-ago crimes that [Appellant] is trying to seek to use….

I find that[,] under the evidence that's available … in this case, that … if these were to be used for any reason, they would have a greater tendency to smear the character of the witness … and suggest propensities that are not related to some of the issues or … at issue in this case. And under the circumstances of this case, and given the age of those crimes, this evidence would not provide a legitimate reason [for] discrediting this witness as an untruthful person under these circumstances.

Based upon the following, based upon those matters, I'm going to deny the request…, and I also find that there was no written notice that was provided to the Commonwealth of this intention. Based on all those factors, I'm going to deny the oral motion *in limine* of [Appellant] to admit the criminal convictions of the alleged victim

in Case Nos. 315 of 2002 and 1964 of 2005, Beaver County numbers.

N.T., 7/6/22, at 18-21.

Appellant argues that "the factors more heavily weigh in favor of admissibility and make it clear that the probative value of admitting the evidence substantially outweighs the prejudicial effect of the *crimen falsi* convictions." Appellant's Brief at 27. He says that his need to introduce the victim's old *crimen falsi* convictions is high, as the jury had to decide between the credibility of the victim, who denied having a knife or other weapon on his person, and the testimony of Appellant and others who alleged that the victim did have a weapon on his person. *Id.* at 28.[3] Specifically, Appellant testified at trial that he cut the victim with a razor blade in self-defense because the victim "had put his hand in his back pocket. That's where [the victim] kept that old raggedy knife at." N.T., 7/7/22, at 209. *See also id.* at 233 (Appellant's stating that the victim "made a move for the door" and "put [his hand] in his pants like that (indicating), no telling what he had").

In addition, Appellant also argues that:

[F]actor one favors admissibility because, if the jury were to learn of the prior convictions of [the victim], they might be more inclined to believe he was not telling the truth when he claimed he had no weapon on his person at the time of the incident; a

---

[3] The others who saw the victim with a weapon were not present when the incident occurred. *See* N.T., 7/7/22, at 155, 158 (Jayvon Turner's stating that he did not personally see anything that happened on the porch, but saw the victim with a knife earlier in the day); N.T., 7/7/22, at 174-75, 177-78 (Frederick Turner's testifying that he was upstairs sleeping when the incident occurred, but that he saw the victim with "something in the back" that Frederick Turner believed was a weapon).

crucial component of Appellant's defense. Moreover, factor two favors admissibility because this is not a case where the alleged victim is accused of a theft[-]related crime and propensity to commit theft is at-issue; rather, the dated convictions bear on the witness'[s] credibility and do not tend to smear his character.[3] Factor three relates to the age and circumstances of the witness. [The victim] was [53] at the time of trial,[4] and the 2006 conviction would have been committed in his adulthood. While the 2006 conviction was approximately sixteen years old at the time of the trial, [this] Court [has] permitted a conviction of the same age for the same reasons it is relevant here.

> [3] Factor four appears to be more related to the Commonwealth's use of this evidence, since it pertains to the strength of the prosecution's case and thus, is not applicable in this analysis.

Appellant's Brief at 28-29 (internal citations and a footnote omitted).

We agree with Appellant that the first two factors tend to weigh in favor of admitting the victim's *crimen falsi* convictions. The victim's convictions for theft by unlawful taking reflect on his honesty, and do not have a greater tendency to smear his character and suggest a propensity to act violently, rather than provide a legitimate reason for discrediting him as an untruthful person. The third factor is a closer question, as the victim was in his thirties at the time he committed the *crimen falsi* offenses, but both convictions were over fifteen years old by the time of trial.

Importantly, though, the fourth and fifth factors weigh heavily against admission. *See Commonwealth v. Felder*, 2022 WL 3210181, at *6 (Pa. Super. filed Aug. 9, 2022) (stating that "[t]he fourth factor turns on the

---

[4] Appellant mistakenly says that the victim was 37 years old at the time of trial. *See* N.T., 7/7/22, at 60 (the victim's stating at trial that he is 53 years old).

- 9 -

importance of the witness's credibility and strongly favors admission of the prior *crimen falsi* conviction where the witness's testimony is central to the case") (citations omitted)[5]; ***see also Palo***, 24 A.3d at 1056 (describing the fifth factor as whether alternative means of attacking the witness's credibility exist). Significantly, as the trial court noted, there was a video of the incident taken from a neighbor's security camera. ***See*** Commonwealth's Exhibit 8. As the Commonwealth observes, because the criminal conduct that formed the basis of the jury's verdict was captured on video, it was less likely that the trial would come down to a credibility contest between the victim and Appellant. Commonwealth's Brief at 10. The Commonwealth aptly explains:

> [T]he crime in the present case was captured on video. Thus, the competing accounts offered by the victim and Appellant from the witness stand as to whether the victim reached for a knife or not could easily be judged by resorting to the video footage. The jury watched Commonwealth's Exhibit 8 numerous times during the trial, and the footage clearly does not show the victim reaching for anything with his right hand as Appellant claimed in his direct testimony.

***Id.*** at 15-16.[6] Further, given the direct footage of the incident, had the victim been untruthful about reaching for a knife or making some other kind of

---

[5] ***See*** Pa.R.A.P. 126(b) (setting forth that an unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019, may be cited for its persuasive value).

[6] Although the video was taken from a distance, our review of it confirms that the victim did not reach in his pocket, or move to the front door, before Appellant attacked him. ***See also*** TCO at 52 ("Evidence involving camera footage of the altercation was also admitted; that surveillance footage showed … Appellant and the victim standing on the porch in a manner consistent with
*(Footnote Continued Next Page)*

movement, the video would show otherwise and serve to undermine the victim's credibility. Thus, we are unconvinced that the trial court abused its discretion in disallowing the admission of the victim's *crimen falsi* convictions.[7]

Judgment of sentence affirmed.

---

the testimony provided by [the victim]. This footage also depicted … Appellant leaping towards the victim and the victim fleeing the scene.").

Further, to the extent Appellant argues that there was a credibility contest over whether the victim was carrying a knife, we consider that argument to be unpersuasive. Even if the victim was carrying a knife, that fact does not prove that Appellant was justified in attacking him, if Appellant was not facing a life-threatening situation, had a duty to retreat and could safely do so, and/or provoked the use of force. *See Commonwealth v. Charles*, 2023 WL 7015598, at *4 (Pa. Super. filed Oct. 25, 2023) ("The Commonwealth can disprove a claim of self-defense or defense of others by establishing that: 1[.] the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2[.] the accused provoked or continued the use of force; or 3[.] the accused had a duty to retreat, and the retreat was possible with complete safety. The Commonwealth must establish only one of these three elements beyond a reasonable doubt.") (cleaned up). Appellant's argument ignores these other considerations.

[7] Because we determine that the trial court did not abuse its discretion in determining that the probative value of the victim's convictions did not substantially outweigh their prejudicial effect, we need not address whether the notice given to the Commonwealth was sufficient.

- 11 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/29/2023

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

    vs.

TYRONE CLARK

:
:
:
:
:
:
:
:

CP-04-CR-01651-2021

1412 WDA 2022

Shahen, Mitchell P.

JANUARY 30, 2023

## OPINION OF LOWER COURT PURSUANT TO PA.R.A.P. RULE 1925(a)

Tyrone Clark ("Appellant" or "Clark") appeals from the August 5, 2022, judgment of sentence entered by the Court of Common Pleas of Beaver County following his convictions of Aggravated Assault,[1] Simple Assault,[2] and Recklessly Endangering Another Person.[3]

## PROCEDURAL HISTORY

The charges against the Appellant stem from an incident occurring at 924 Beaver Avenue, Ambridge, Pennsylvania, in the early evening hours of September

---

[1] 18 Pa.C.S. § 2702 (a)(1)
[2] 18 Pa.C.S. § 2701(a)(1)
[3] 18 Pa.C.S. §2705

11, 2021. The incident involved an altercation between the Appellant and the victim, William Christopher Brown ("Chris Brown" or "victim").[4]

By Criminal Information dated November 5, 2021, the Appellant was charged as follows: (1) count of Criminal Attempt—Criminal Homicide (First Degree Felony)[5]; (1) count Aggravated Assault (First Degree Felony)[6]; (1) count Simple Assault (Second Degree Misdemeanor)[7]; (1) count Recklessly Endangering Another Person (Second Degree Misdemeanor)[8]; (1) count Harassment—Subject Other to Physical Contact (Third Degree Misdemeanor)[9].

Appearances were made by Assistant District Attorney Bart Wischnowski ("Mr. Wischnowski") for the Commonwealth, and Attorney Max A. Schmierer ("Mr. Schmierer") for the Defendant. Jury selection began on July 5, 2022, and the trial was conducted from July 6, 2022 to July 8, 2022. On July 11, 2022, the Jury returned a verdict finding the Appellant guilty of Count 2: Aggravated Assault, Count 3: Simple Assault, and Count 4: Harassment; the jury was deadlocked as to Count 1: Criminal Attempt—Criminal Homicide.

On August 5, 2022, the Appellant was sentenced to undergo imprisonment in a State Penal or Correctional Institution or Facility at Count 2 for not less than

---

[4] William Christopher Brown is also known as Chris Brown socially and throughout his community.
[5] 18 Pa.C.S. § 901(a); 18 Pa.C.S. § 2501(a)
[6] 18 Pa.C.S. § 2702(a)(1)
[7] 18 Pa.C.S. § 2701(a)(1)
[8] 18 Pa.C.S. § 2705
[9] 18 Pa.C.S. § 2709(a)(1)

twenty-five (25) years, nor more than fifty (50) years. The court imposed no further sentence at Count 3 and Count 4.

The Appellant filed a timely post-sentence motion on August 10, 2022. On November 4, 2022, the court entered an Order denying Appellant's Motion for Post-Sentence Relief.

On November 30, 2022, the Appellant filed a Notice of Appeal to the Superior Court of Pennsylvania. On that same day, this court entered an Order requiring the Appellant to file a Concise Statement of Matters Complained of on Appeal, pursuant to Pa.R.A.P. §1925(b). The Appellant timely filed a Concise Statement of Matters Complained on Appeal and a Concise Statement of Errors Complained on Appeal on December 21, 2022.

## PRELIMINARY MOTIONS

### I. VOIR DIRE

Jury selection took place on July 5, 2022; interviews for Prospective Juror No. JP5A-8 took place on that same day. Mr. Schmierer asked for clarification on an unclear answer provided in Juror No. JP5A-8's questionnaire, in which it appeared the Juror had changed their answer from Yes to No.[10] A summary of the transcript on this matter is below:

> MR. SCHMIERER: And I'm looking at your questionnaire here.
> There, it looks like you may have changed an answer. I'm just trying

---

[10] *Id.* at 53.

to clarify. The question was, "would you have any problem following the Court's instruction that the defendant in a criminal case does not have to take the stand or present evidence and it cannot be held against the defendant if he or she elects to remain silent or present no evidence?" You indicate on your form, it appears to be no, but also, the box may have been check yes.

PROSPECTIVE JUROR NO. JL5A-8: I did change that. I thought about that when I did that, too. My own personal belief is, sometimes I think like if you would be a, if you were the defendant and you were not guilty, you would want people in a jury to hear your side of the case so that they can understand why you're not guilty or where you're coming from, and you'd want to stand up for yourself, because I would want to stand up for myself if something was said against me that was untrue.

MR. SCHMIERER: Right. And that's certainly a reasonable position to take. We just want to know, and of course, if that's your personal belief, that's your personal belief. We just want to know, if the Court were to instruct you on that, as that Court's already, you know, stated, would you be able to not hold anything against a defendant should he or she decide not to testify?

PROSPECTIVE JUROR NO. JL5A-8: I would try, yes.

MR. SCHMIERER: Okay. And I completely understand. By saying "I would try," do you have some reservations about whether you'd be able to do that?

PROSPECTIVE JUROR NO. JL5A-8: I mean I, no. I'd still, like it's still, my own person, if it was me, I would want to defend myself.

MR. SCHMIERER: I understand. Okay. Thank you, ma'am.

MR. WISCHNOWSKI: Good morning, Ma'am.

PROSPECTIVE JUROR NO. JL5A-8: Hi.

MR. WISCHNOWSKI: Just a few follow ups.

PROSPECTIVE JUROR NO. JL5A-8: Okay.

MR. WISCHNOWSKI: So if Judge Shahen instructed you and the other potential jurors you can't hold it against the defendant if he chooses not testify could you follow that instruction?

PROSPECTIVE JUROR NO. JL5A-8: Yes.

MR. WISCHNOWSKI: Thank you.

(WHEREUPON, the prospective juror left the courtroom)

After the trial court heard arguments regarding the Motion to Strike. The juror was returned to the courtroom and the following occurred:

...

THE COURT: Okay. So, there's been some questions that were raised, and I just have a question or two to ask you. This involves something you've already discussed, and as I was telling the parties, I was listening. I'm going to ask you basically the question that Mr. Wischnowski asked you, and I know he asked you a lot. I told you in the beginning that I'm going to give instructions on the law and you are to follow them, but also, I told you that you have to answer questions with candor and honesty. The candor is important here.

PROSPECTIVE JUROR NO. JL5A-8: Okay.

THE COURT: I'm going to instruct you, as I told you earlier, that Mr. Clark, as all Defendants, are presumed innocent. I'm also going to instruct you that the Defendant has an absolute constitutional right not to take the witness stand, and I'm going to tell you that cannot be held against him to any extent. I don't use that extra qualifier, but that is to say it simply cannot be.

PROSPECTIVE JUROR NO. JL5A-8: Okay.

THE COURT: That is a fundamental principle, and if you can't follow that, that's fine. If you think that there's a chance that you won't follow it, just let us know. So, the question is, if I instruct you on that principle, that he has that absolute right not to testify and it can't be held against him, will you follow that instruction?

PROSPECTIVE JUROR NO. JL5A-8: Yes.

...

(WHEREUPON, the prospective juror left the courtroom).

THE COURT: So, gentlemen, I might add that that answer is consistent, and although I didn't observe the demeanor during the initial question, I did hear it and it sounded that same, with that same

resonance, and so Mr. Schmierer, I'm going to respectfully deny your motion to strike this juror.[11]

## II.    PRE-TRIAL MOTIONS

Prior to opening statements, the parties met with the Court on record. The Court addressed the defenses' motion in limine to include evidence of the victim's prior convictions. The defense provided dockets and criminal information for two cases involving Chris Brown.[12] A summary of the Court's findings on that motion are below:

> Based on the documents that have been presented to the Court, Case No. 1964 of 2005 contains a guilty plea that occurred on July 19, 2006, to Count 1, which was theft by unlawful taking as Misdemeanor in the Second Degree with the factual allegations that can be ascertained from the exhibit being that a toolbox containing several tools belonging to Steven Dean was unlawfully taken by the alleged victim in this case, William Brown.
>
> The facts at Case No. 3157, where the alleged victim in this case was charged with and convicted of theft by unlawful taking and received a two-year probation sentence on November 25, 2003, are not evident on the exhibits.
>
> Under Rule 609, for the purposes of attacking the credibility of a witness, evidence that a witness has been convicted of a crime must be admitted if it involved dishonesty and/or false statement. The Court finds that these two convictions do involve dishonesty and/or false statements, dishonesty in particular.
>
> However, under the same rule, if more than ten years have passed since the witness's conviction, and that is the case, or released from confinement, whichever is later, evidence of the conviction is admissible only if the probative value substantially outweighs its prejudicial effect. Additionally, the proponent in this case, the

---

[11] *Id.* at 58-63.
[12] Defense Pretrial Exhibits A and B.

Defendant, must give an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

By virtue of the plea, the evidence in Case No. 1964 of 2005, I can say that on the date of that plea, the alleged victim was thirty-seven years old. That information is gleaned from the Guilty Plea Colloquy that is part of this hearing evidence now. In this case, the Defendant, based upon our discussions yesterday, has available alternative means for attacking the witness's credibility and those alternative means consist of different versions of the story, among other things—at least as were recounted to me by counsel last night.

In this case, the Court is also aware, based upon the discussions, that the Commonwealth contends that it has a [surveillance] video, as well as video of the officer's body cam, that would allegedly show the Defendant in the area where the incident occurred.

There is no evidence indicating that the alleged victim in this case, from the time of 2006 to the current time, has not or could not have been rehabilitated during that time, and there is no indication of a history of other matters from the long-ago crimes that the Defendant is seeking to use in this case.

I find that under the evidence that's available in this case, that if these were to be used for any reason, they would have a greater tendency to smear the character of the witness and suggest propensities that are not related to the issues or at issue in this case. And under the circumstances of this case, and given the age of those crimes, this evidence would not provide a legitimate reason to discredit this witness as an untruthful person under these circumstances. I also find that there was no written notice that was provided to the Commonwealth of this intention.

Based on all those factors, I'm going to deny the oral motion in limine of the Defendant to admit the criminal convictions of the alleged victim in Case Numbers 315 of 2002, and 1964 of 2005, Beaver County numbers. [13]

---

[13] Transcript of Record, July 6, 2022, at 18-22.

The next issue addressed in the pre-trial discussions involved the admission

of a recorded phone call made by the Appellant while he was incarcerated at the

Beaver County Jail. The relevant portions of the transcripts are summarized below:

> THE COURT: Is there a dispute as to what part is to be admitted?
>
> MR. SCHMIERER: One section of the jail call.
>
> MR. WISCHNOWSKI: We both listened to it last night, Your Honor, and from minute 18:04 to minute 18:20, the Defendant states that, he states the name of an individual and says that he'd like that person to put together for the boys something to drop the charges. Like, the only way he can drop the charges is if he admits he had a knife, unquote. It's seconds, and we would be offering it to show that the Defendant intended to try to bribe the victim into not coming into court or bribing him into saying that he had a knife so this was self-defense.
>
> THE COURT: All right. Can you read the quote again to me?
>
> MR. WISCHNOWSKI: He's talking to a female and he says... "Talk to Will to put together for the boys something to drop the charges." Like, the only way he can drop the charges is if he admits he had a knife.
>
> THE COURT: Mr. Schmierer, do you agree that that is the quote that we're talking about?
>
> MR. SCHMIERER: Well, Your Honor, what I'll say first is that, you know, it's difficult for either myself or Mr. Wischnowski to transcribe the call because it was difficult to hear in some respects. I think that it would be most appropriate if the Court listens to this audio, hears the tonality of the speaker, and listens to the words that were stated to determine whether or not this is, in fact, what it says.
>
> THE COURT: I'll listen to it, but if that's what it says, I will make a ruling that it will come in.
>
> MR. SCHMIERER: Okay. And, Judge, I would just like to place on the record my reason for asking that it be excluded. This would be uncharged conduct that the Commonwealth

would be alleging, and it would be essentially going to the character evidence that Mr. Clark is in some way attempting to bribe a witness. The way that I interpreted it is that Mr. Clark was stating that he was understanding that this gentleman Will was putting something together for the boy. I believe he was referring to the alleged victim in this case, to drop the charges. It would be my interpretation and my argument that he was not instructing anyone to bribe any witness or make any sort of request to bribe a witness.

THE COURT: Very well. Now, my question to you, is that a matter of argument if the evidence is admitted? Is that something that you could argue or is that something that precludes the admission of this kind of evidence where somebody does something that expresses a consciousness of guilt?

MR. SCHMIERER: Well, I mean, that's certainly up to the Court to decide, and it would be argued if the Court permits its admission into evidence. But the defense is arguing at this point that it should not be admitted because of the danger of unfair prejudice, here in the fact that it's again uncharged conduct. It's unclear from the call the identity of the individual with whom Mr. Clark is speaking. It's also unclear from the call whether or not Mr. Clark is, in fact, instructing somebody to undertake this action or if he's merely stating that it's his understanding that such an action is being taken. [14]

…

THE COURT: Mr. Wischnowski, will you be admitting something into evidence which would be the record of this phone call?

MR. WISCHNOWSKI: Yes. It's going to be Commonwealth's Exhibit 9.

…

MR. WISCHNOWSKI: Your Honor, the contested portion starts at 18:04. It's very quick. It's from 18:04 to 18:20.

---

[14] *Id.* at 22-26

THE COURT: If you wouldn't mind, play a little bit before, Mr. Wischnowski, so that I can warm up to the different affects that I'll be listening to.

MR. WISCHNOWSKI: I'll start it at 17:50.

...

MR. WISCHNOWSKI: It's at 18:01 right now, so in 3 seconds it'll be Mr. Clark speaking

(WHEREUPON, the audio was played).

...

THE COURT: Okay. What the Court hears is "Talk to," literally word-for-word as I hear it, "Talk to Will because Will's supposed to give the boy something to drop the charges." To me that's the part that I need to rule on. That's the part that, in effect, Mr. Schmierer, what I have to determine is whether that could be interpreted as consciousness of guilt, whether I can make the connection between Mr. Clark over there and what is supposed to be given to the boy, to, quote, "to drop the charges."

Who is the person? Who is the person that's involved in giving the boy something to drop the charges? If I determine that it can be interpreted to be Mr. Clark, well, then it's going to consciousness of guilt. If I say, well, it doesn't sound that way and it can't be interpreted way, then we can't attribute that to Mr. Clark.

If this could be interpreted in such a way that Mr. Clark is seen as trying to put something out there to have the boy "not show up," and I use that in a quote because that's what we're talking about, then it's admissible. And I think that it's for the jury to decide if it can be interpreted that way, because I believe it surely can, and in my audio observation, it's something that can be interpreted that way, especially when you consider that the continuation of the phrase is about dropping the charges, and it's clear what the discussion was, and that's what that issue concerned.

I understand and recognize Mr. Clark's objection. However, I'm going to overrule that objection. Your objection and Mr.

Clark's will be noted for the record so it's preserved. That's what that means. And we'll let the jury hear that part of it.

So, Mr. Wischnowski, the ruling is that the Commonwealth can play the audio straight through, assuming there are no other objections and it's properly authenticated.[15]

## TRIAL

Trial commenced on July 6, 2022. The Commonwealth called multiple witnesses during their case in chief. For purposes of this opinion, testimony of Officer John Bialik, Jacque Brown, Beaver County Warden William Schouppe, Dr. Sabrina Christie, and William Brown have been summarized.

On July 6, 2022, the Commonwealth called John Bialik ("Bialik"), a police officer from the Borough of Ambridge, as their first witness.[16] Bialik was patrolling Ambridge on September 11, 2021. At 7:35pm that evening, Bialik was dispatched to the area of 10th and Beaver Road for a report of a stabbing. Bialik testified that as they approached 952 Beaver Road, he encountered the victim in the screened-in porch of the residence. Bialik testified that Chris Brown's demeanor was scared, "like he was going to die"[17] and that he was holding a white t-shirt that had turned red from being clenched to an injury on his neck, which ran from his jawline, across his neck to the other side of his jawline.[18] There were

---

[15] *Id.* at 106-113
[16] *Id.* at 68.
[17] *Id.* at 73.
[18] *Id.* at pg. 73

additional wounds to Brown's armpit areas.[19] Bialik stated that his main concern when he saw Brown was to get him emergency medical attention or he might die.[20]

Officer Bialik received an account of the incident from the victim that he went to the home of Ambridge resident Fred Turner when the defendant who was on the porch of that residence slashed the victim, Chris Brown, "out of nowhere."[21] Brown was subsequently transported to a hospital by medical helicopter.[22]

Bialik walked down the street to Turner's house to secure the crime scene and search for Tyrone Clark.[23] Once at the residence, Bialik observed a trail of blood starting on the porch of the residence, leading onto the sidewalk and street.[24] Crime scene photographs, marked as Exhibit 2a through 2i,[25] showed blood splatter behind a white car parked near 924 Beaver Road,[26] blood on the street,[27] and blood directly on the staircase of the residence.[28]

At the Turner home, Bialik came into contact with Freddie Turner and Jayvon Turner who directed him to the upstairs apartment where he found Tyrone

---

[19] *Id.* at 74.
[20] *Id.* at 74.
[21] *Id.*
[22] *Id.* at 100.
[23] *Id.* at 77.
[24] *Id.* at 92.
[25] *Id.* at 88. Admission of Exhibit 2 and 3 were stipulated/agreed to be admitted with the consent of both parties prior to trial.
[26] *Id.* at 97.
[27] *Id.* at 99.
[28] *Id.* at 100.

Clark in one of the bedrooms. [29] At this time, Bialik observed visible blood splatter on Clark's shoes. Clark was wearing clothes that matched the description given to police by Chris Brown; Clark was placed into custody immediately.[30]

Bialik went to the residence of Jacque Brown, a neighbor on Beaver Road, who Bialik knew to have security cameras. Bialik spoke with Jacque Brown, who provided him with security camera footage.[31] Bialik was able to obtain an email from Jacque Brown containing the footage by the time he got back to the police station and before he filed the Criminal Complaint.[32]

On cross-examination, Bialik was asked to describe his career in law enforcement, how police reports are written, what procedures are followed by the Ambridge Police Department in the course of conducting interviews, and when information gets turned over to the District Attorney's office.[33] Bialik stated that he was the affiant in this case, and as such he took charge of the investigation.[34] The following segments of the transcripts are relevant to the issues on appeal, and are included verbatim below:

> [MR. SCHMIERER ("Q")]: Okay. And would you agree, it's also important as the affiant and investigating officer to interview witnesses?
> [BIALIK ("A")]: Yes.

---

[29] *Id.* at 77.
[30] *Id.*
[31] *Id.* at 87.
[32] *Id.* at 134-135.
[33] *Id.* at 115-119.
[34] *Id.* at 120, 121.

...

Q: Okay. And the goal of an interview would be to try to get to the truth of what happened in a case. Is that fair?

A: Yes.

Q: Okay. And so, you know, obviously the point of the investigation is to find out what actually happened in the case. That's fair?

A: Yes.

Q: And so part of your investigation, of course, gathering the physical evidence as well as interviewing witnesses. That's fair?

A: Um-hum.

Q: Okay. And you just testified that you've done interviews in the past in that interview room at the police—

A: Yes.

Q: --the police department; correct? In the past have you had the opportunity to interview somebody who was being accused of a crime?

A: Yes.

Q: The alleged perpetrator?

A: Yes.

Q: Okay. And is it fair to say that you would interview this person with the goal of trying to, well, one, trying to find out what their version of the events would be? Is that fair?

A: Yes.

Q: Okay. And it would also be potentially to, if there was incriminating evidence, to get it from them. Is that fair?

A: Yes.

Q: Okay. And, you know, certainly there's stages of how you would do this. You have to read them their Miranda rights. Is that true?

A: Yes.

Q: And if they want to speak with you, then at that point they would be able to speak with you. Is that true?

A: Yes.

Q: Okay. And using your training as a police officer, you would interview them and gather this evidence in the course of your investigation?

A: Uh-huh.

Q: That's fair? Okay. And this can also serve in some circumstances, if you interviewed a potential suspect, if you were to determine after that interview that they weren't a potential suspect, it could potentially clear that person. Is that fair?

A: Yeah.

Q: Okay. So, and obviously the goal of the investigation is to uncover the truth of what's going on. That's accurate?

A: Uh-huh.

Q: Okay. Now, again, what's in your report you testified is the full account of what you did in your investigation in this case. Is that true?

A: Yeah.

Q: Okay. Now, is it fair to state that in this case you did not conduct a witness interview of the Defendant Mr. Clark? Is that true?

A: We did not formally interview him, no. He declined a statement.

Q: Okay. Is that in your report?

A: It is not.[35]

On redirect, the following questions were asked:

MR. WISCHNOWSKI: Now, you were asked a number of questions about the completeness of your investigation by Mr. Schmierer; correct?

BIALIK: Correct.

MR. WISCHNOWSKI: Is your duties as a police officer, is it fair to say that you communicate with the attorneys for the Commonwealth and the attorneys for the defense quite frequently; correct?

BIALIK: Correct.

---

[35] *Id.* at 122-125

MR. WISCHNOWSKI: Is it customary for the defense to reach out to the police sometimes to ask you questions about a case that you know of?

MR. SCHMIERER: I'm going to object, Your Honor. Can we have a side bar?

THE COURT: Alright.

(WHEREUPON, the following proceedings were had at sidebar:)

MR. SCHMIERER: I would ask for an offer of proof. I'm not sure where this going with the defense communicating with the affiant, and I think it's beyond the scope of cross.

MR. WISCHNOWSKI: Your Honor, he asked a lot of questions about the completeness of the investigation. I just want Officer Bialik to testify whether or not Mr. Schmierer reached out to him to clarify some of these points and whether he would have made himself available, if asked.

MR. SCHMIERER: I don't know that it's appropriate then for the Commonwealth to suggest that the defense has some obligation to communicate with the arresting officer about any matters. I think what the Commonwealth, what Mr. Wischnowski is trying to suggest to the jury is that somehow, as a defense attorney, I have to reach out to the arresting officer and try to set up some sort of interview—

THE COURT: The objection's overruled. It's not that he's saying it's an obligation. I don't see that as the question. I see it as you've now asked a lot of questions, the majority of the questioning of the investigation and how he conducts it and his accessibility to you, not an obligation. Your objection's overruled.

MR. SCHMIERER: If I could just renew my, what I tried to do is just phrase my questions as being pertinent to the initial statement of the investigation. With respect to Mr. Clark, I believe that after Mr. Clark has been given counsel, it would be inappropriate to comment on his giving any sort of statement once he had received counsel because he has a Sixth Amendment right to counsel, and he doesn't have to give a statement. He did not have counsel at the scene when the questions were directly whether or not he had been interviewed by police at the scene. And after that once he received counsel, to comment on whether or not counsel has to reach to the police to try to get counsel's

client's interview or anything like that I believe would be inadmissible encroaching on the right—

THE COURT: The objection is overruled.

MR. SCHMIERER: Thank you, Your Honor.

(WHEREUPON, the sidebar proceedings were concluded, and thereafter the following proceedings were had in open Court:)

THE COURT: Mr. Wischnowski.

MR. WISCHNOWSKI: Thanks, Your Honor. Officer Bialik, I was asking you about your communications, just in general, with defense attorneys with the cases that you conduct, the investigations that you lead. Do you know pretty much every criminal defense in this county?

BIALIK ["A"]: I know a lot of them I would say. Yeah, I know a lot of them.

MR. WISCHNOWSKI ["Q"]: Do you communicate with them almost every day or at least every week?

A: Honestly, no. I hardly ever. Minus a few, I hardly ever speak to them.

Q: If a defense lawyer reached out to you to ask you some questions about your investigation, would you make yourself available up until the time of trial?

A: If someone called, yes.

Q: Did anybody on Mr. Clark's behalf reach out to you to ask you some of those clarifying questions?

MR. SCHMIERER: I'm going to renew my objection, Your Honor.

THE COURT: Overruled.

BY MR. WISCHNOWSKI:

Q: The question is, did Mr. Schmierer or any counsel or Mr. Clark ever reach out to you to ask you to clarify some of those things you were asked about?

A: No.

Q: Now, you got to watch the video that Mr. Schmierer referenced of the surveillance camera footage; correct?

A: Yes.

Q: That was provided to you by Jacque Brown?

A: Yes.

Q: And you watched it before you filed the charges; correct?

A: Yes.

Q: Did that impact the way that you filed the charges and the decisions that you made when you prepared your Criminal Complaint?

A: Yes.

Q: How did it influence you? Well, let me ask it to you this way. How many people were in that footage?

A: Two.

Q: And were you able to identify them easily?

A: Yes.

Q: Who were they?

A: It was William Christopher Brown and the Defendant.

Q: Why weren't you concerned that Mr. Brown might have raised a knife before the Defendant raised his knife?

A: His, it appeared he had his arms crossed. I don't want to, we'll say, you couldn't really see his arm, but you could see he was in a non-threatening manner—

MR. SCHMIERER: Your Honor, I'm going to object at this point. I think that we're discussing the video that we've, that hasn't been admitted into evidence at this point, and obviously the video is the best evidence of what is being discussed.

THE COURT: Overruled.

MR. WISCHNOWSKI: Thank you.

BY MR. WISCHNOWSKI:

Q: So you were explaining that Mr. Brown was standing in a nonthreatening way. How was the beginning of the video, how was Mr. Clark portrayed in that video?

A: Passive. If I had to describe him, he was lounging.

Q: Was he seated?

A: Yes.

Q: And is there a point where he's not in his seat any longer?

A: Yeah. He gets up, and it appears from the video that he is also nonthreatening until all of a sudden you could see him moving, but it wasn't, like, aggressive, like hands up like he was going to fight. He was just moving, and then you see a sudden thrust[sic].

Q: Based on your evaluation of that video which we'll see soon, was Mr. Brown ready for the actions that the Defendant took?

MR. SCHMIERER: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. WISCHNOWSKI:

Q: After you watched the video and evaluated both parties' behavior, did you think there was any basis to believe that the Defendant acted in self-defense such that you couldn't file charges?

MR. SCHMIERER: Objection. This calls for legal conclusion.

THE COURT: Sustained. [36]

The Commonwealth's next witness was Jacque Brown, a neighbor of Fred Turner, who provided surveillance footage related to the incident to investigating officers.[37] Jacque Brown testified that she reviewed her security footage after Officer Bialik came to her residence and asked her to check her cameras.[38]

Approximately one minute of the video was played for the jury; Jacque Brown was able to verify the contents of the video and confirmed that the camera that captured this footage was motion activated.[39] The footage depicted Chris

---

[36] *Id.* at 137- 144
[37] *Id.* at 144
[38] *Id.* at 148.
[39] *Id.* at 150-152; *see also,* Commonwealth Exhibit 8.

Brown standing by a pillar on Fred Turner's porch with the Appellant seated behind him.[40]

The Commonwealth's next witness was William Schouppe ("Schouppe"), Warden of the Beaver County Jail,[41] who verified that the Appellant was an inmate at the Beaver County Jail in September of 2021.[42] Inmates at the facility are allowed to place and receive phone calls, these phone calls are recorded and subjected to monitoring 24/7;[43] both parties on the call hear an audio recording that informs them the call is subject to monitoring and recording.[44]

Schouppe testified that the Appellant placed a phone call on September 26, 2021, and that Schouppe had an opportunity to review and authenticate the recording prior to giving his testimony.[45] The jail phone call was admitted under Commonwealth's Exhibit 9 and played for the jury with no objection from the defense.[46]

Dr. Sabrina Christie, a staff surgeon at UPMC Presbyterian, was called as a witness for the Commonwealth.[47] Dr. Christie covers the trauma surgery service and attends to patients who are injured or have surgical emergencies.[48]

---

[40] *Id.* at 151.
[41] *Id.* at 154.
[42] *Id.*
[43] *Id.* at 156.
[44] *Id.*
[45] *Id.* at 157.
[46] Portions played during trial and submitted to evidence were limited to (1) from minute 4:39-4:59; (2) 8:34-8:54; (3) 14:07-14:55; (4) 18:04-18:20.
[47] *Id.* at 165.
[48] *Id.*

During her testimony, the Commonwealth asked Dr. Christie to "educate the jury a little bit about the different types of bleeds that you might see and how you might rank or characterize the types of bleeds that [she would] see in the trauma unit?"[49] at which point a sidebar was requested by the defense, which is transcribed verbatim below:

> MR. SCHMIERER: Judge, it's my understanding that Commonwealth does not intend to qualify this witness as an expert in this case, and I thought it was fair for the Commonwealth to have the doctor testify a little bit about the trauma unit and her experience there. My concern is that she's now getting into medical specific testimony that would require her being made an expert. If she starts giving medical testimony about different types of bleeds and what she categorizes as different types of injuries, now, it's my understanding the Commonwealth will ask her about her observations about the alleged victim, what she did, which I think is fair fact testimony, but to ask her medical scientific opinion questions about the types of injuries and how she categorizes them I think goes beyond a fact witness and it moves it into the realm of an expert testimony. And the Commonwealth in its statement did not intend to offer this witness as an expert, and so I just want to make sure that we keep it as a fact witness.
>
> THE COURT: Mr. Wischnowski.
>
> MR. WISCHNOWSKI: Your honor, she just described the different levels of trauma, 1 through 3, and I want her to be able to explain William Brown was admitted at the highest tier as a Level 1. I think she deserves to give some content, and I haven't asked her any opinion testimony. I haven't asked her to draw any opinion-based conclusions.
>
> MR. SCHMIERER: If I may respond, Judge.
>
> THE COURT: Yes.

---

[49] Pg. 170-171

MR. SCHMIERER: I think that she can say that Mr. Brown was a Level 1, because that's a fact. I think to ask her the specifics about why, delve into her opinion about why she thinks that this person was admitted as a Level 1, it, I think is, it's kind of nuanced, but I would ask the Court to restrict the testimony to just what her observations were and the fact that he was admitted to Level 1. That's a fact. Why was he admitted to Level 1? Well, because his injury met certain criteria that would—

THE COURT: All right. The objection is overruled. I see in this testimony where we are now. If we go to a point where an expert opinion is being asked, you can renew your objection, but where we are now is seen as foundational. Given her experience so far, there's circumstances she has to know to serve in this capacity. So, I think that she can say and serve in this capacity. They aren't expert opinions. But if you think the line is crossed, we're not there yet, you will have obviously an opportunity to renew your objection and continue our discussion.[50]

Dr. Christie generally described different types of bleeds that occur in a patient with a laceration injury. She also described how trauma is leveled in order to care for patients admitted at UPMC, explaining, "a Level 1 trauma is if you have a penetrating injury, meaning a cut or a gunshot wound to your arms closer to your body than the elbows, your legs closer to your body than the knees, anywhere on your torso at all, or on your head and neck, and the reason is that those injuries are, by definition, life threatening."[51] The Commonwealth then turned to the following questions:

MR. WISCHNOWSKI: And let's turn it more specifically to lacerations across the neck.

A: Okay.

---

[50] *Id.* at 173.
[51] *Id.* at 174.

Q: How many of those have you treated in your years working around the hospital?

A: Hundreds.

Q: Now, and have you studied anatomy extensively throughout your different levels of education?

A: I have.

Q: Explain the significance what the platysma muscle is.

A: So, the platysma muscle is a fine muscle that overlies the front of the neck. If, you can see, I can show you. It's that muscle when I flex (demonstrating). It's very thin.

If a penetrating injury, a knife or a gunshot wound goes through that platysma muscle, it enters the zone of the neck where all of the major structures lie. And so, if you have a laceration that doesn't make it through that muscle, classically you can wash that laceration out at the bedside. It doesn't need to be taken to the operating room because you have really no shot of having a serious injury.

Deeper than that, you go to the operating room because you could cut any number of things that are life threatening.

Q: In terms of the depth of the cut, how many centimeters past the platysma is concerning as a trauma surgeon?

A: Anything—

MR. SCHMIERER: Your Honor, I'm going to object at this point. I think we're, again, we're going beyond that scope of fact to opinion witness.

THE COURT: Mr. Wischnowski.

MR. WISCHNOWSKI: Your Honor, I didn't ask her to give an opinion. I asked her factually as a trauma surgeon how deep does a cut have to be to be concerning. Again, this is within the context of the different levels of trauma that she's already discussed.

THE COURT: Well, based on what we discussed and the progress of your questions, I am going to sustain the objection and ask you to move on.

BY MR. WISCHNOWSKI:

Q: You said that there's major parts of the neck that if you pierce the platysma are very concerning. What are those body parts or vessels?

A: So there's the major artery and vein that go to the brain and come back from the brain. So that's your carotid and your internal jugular. And then there's a thick nerve that runs with that bundle that it's very important not to cut as well called the vagus nerve. And then the other structures that we really worry about being immediately life threatening are any injury to the trachea, the airway, or to your esophagus. That won't immediately kill you, an esophageal injury, but it will kill you in a number of hours.

Q: Now, let's turn to September 11, 2021. Were you working in the trauma unit at Presby that evening?

A: Yes. I was the staff surgeon on call.

Q: And did you treat a patient named William Brown that evening?

A: I did.

Q: And based on the things you did that night with your patient William Brown, did you prepare a report?

A: I dictated an operative dictation, yes.

...

Q: I'm handing you a document. Can you take a look at that? Do you recognize that two-page document?

A: I do.

Q: What is it?

A; It's my operative dictation, so my description of what I did in the operating room.

Q: And is there a date near the top of it, a surgery date?

A: Yes.

Q: What is that date?

A: It is 9/11/2021.

Q: And above that, does it say the patient name?

A: It does.

Q: What's the name of the patient?

A: William Brown.

...

MR. WISCHNOWSKI: Your Honor, I'd move for admission of Commonwealth's Exhibit 11.

THE COURT: Any objection?

MR. SCHMIERER: Can we approach?

THE COURT: Sure.

(WHEREUPON, the following proceedings were had at sidebar:)

MR. SCHMIERER: I don't have any objection to this being admitted and made part of the official record. I just want to clarify for the record, and I think Mr. Wischnowski agrees, this should not go back to the jury.

THE COURT: Right.

MR. WISCHNOWSKI: Yeah. I'm not asking for that.

MR. SCHMIERER: As long as that's clear, I don't have an objection to it being admitted and made part of the official record.

...

BY MR. WISCHNOWSKI:

Q: Now, walk us through when you first became aware of Mr. Brown's admission to the trauma, or to the hospital that night.

A: We all carry pagers that all these Level 1 and Level 2 traumas are sent out across so that we can respond appropriately. The patient obviously met criteria for a Level 1 trauma, and so a Level 1 page was sent out, and we came to the trauma bay.

The patient was brought in with a large dressing over his neck which is often the case when somebody has substantial bleeding. People tend to cover it up with a dressing trying to stop the bleeding, but you can hide a lot of blood under the dressing. So, one of the very things that we do is to make sure that we see the injury, so I took the dressing down very quickly, and it was immediately clear that this was a life-threatening bleed.

...

Q: I'm going to show you Commonwealth's Exhibit 4.[52] I understand that, that's already in evidence, but I understand you didn't take that photo, but does that look similar to the sight you say when you looked at Mr. Brown?

A: It does.

Q: Okay. And what's, as an experienced surgeon, as an experienced medical practitioner, what is your biggest concern when you look at something like that in a patient?

MR. SCHMIERER: I'm going to object, Your Honor. I think—

THE COURT: Rephrase the question.

BY MR. WISCHNOWSKI:

Q: What's your priority when you look at a patient who has a laceration across his neck and his throat like that?

A: Preventing him from dying.

Q: So what is the first thing that you did when you saw him after you looked at the wound?

A: He was actively bleeding in a life-threatening way, and so I manually compressed the bleeding, which in him was the entire rim of tissue on the lower portion of this laceration. So I wrapped with my hands like this (demonstrating).

...

Q: Okay. So where did you take him?

A: To the operating room immediately.

...

Q: So, you get up to the operating room. Tell us what you did next.

A: Well, the patient had to have a breathing tube placed, so I held the incision while the anesthesiologist placed the breathing tube there.

And then in order to move him over and clean the area as we normally do for surgery, I couldn't move my hands, and I believe my resident was in another room with another trauma, and so I actually had to have the anesthesiologist, I showed him where to hold, and I very

---

[52]Commonwealth Exhibit 4 was a photograph of the neck wound sustained by the victim, Transcript of Record, July 6, 2022, at 72, *Commonwealth v. Clark*, 1651 of 2021.

quickly got some sutures and I over-sewed the exsanguinating bleeding so I could just prep him for operation.

Q: How common is that to go right to stitching at that point in the operating procedure?

MR. SCHMIERER: I'm going to object, Your Honor.

THE COURT: Sustained.

BY MR. WISCHNOWSKI:

Q: Now, did you take note of how big the laceration across the neck was?

A: I measured it in the operating room.

Q: How big was the laceration?

A: It was 14 centimeters long by 7 centimeters wide by 5 centimeters deep.

Q: Is the 5 centimeters in depth enough to pierce the platysma muscle?

MR. SCHMIERER: I'm going to object, Your Honor. Again, this is, calls for expert testimony.

THE COURT: Overruled.

BY MR. WISCHNOWSKI:

Q: You can answer the question.

THE COURT: In this particular case we're talking about?

MR. WISCHNOWSKI: Yes.

THE COURT: All right.

BY MR. WISCHNOWSKI:

Q: In this particular case, was the 5 centimeters in depth that you observed enough to pierce the platysma muscle?

A: His platysma muscle was completely separated.

...

Q: Now, to sum it all up, was Mr. Brown in danger of death before he came into your care that night?

MR. SCHMIERER: Objection, Your Honor.

THE COURT: Overruled.

BY MR. WISCHNOWSKI:

Q: Was he—

A: Yes. Absolutely.

Mr. Wischnowski: No further questions, Your Honor. [53]

The following day, the Commonwealth called the alleged victim, William Christopher Brown ("Chris Brown"), to testify. [54] Chris Brown testified that he has lived on Beaver Road for 21 years,[55] and had interacted with Tyrone Clark before the incident occurred.[56] Chris Brown stated that he knew Clark well enough to recognize him in person, and accurately identified him in the courtroom during his testimony.[57]

On September 11, 2021, at around 7:30 p.m., Chris Brown left his house and headed for Fred Turner's house to see Jayvon Turner, explaining that he had no weapons on him.[58] When he arrived at Fred Turner's porch, Tyrone Clark was sitting on the Turner's porch. Brown asked Clark if he could go get Jayvon Turner for him, Clark told Brown to knock on the door.[59] Chris Brown began knocking on the door, but received no response.[60] At this point, Chris Brown rested against the porch post, with his hands folded underneath his arms.[61] Chris Brown testified that

[53] *Id.* at 175-187.
[54] Transcript of Record, July 7, 2022, at 61, *Commonwealth of Pennsylvania v. Tyrone Clark*, 1651 of 2022.
[55] *Id.*
[56] *Id.* at 62.
[57] *Id.*
[58] *Id.* at 70.
[59] *Id.* at 66.
[60] *Id.*
[61] *Id,* at 67, 69; *see also,* Commonwealth Exhibit 2(d).

at this point he said to Clark, "You can't get up and get him out for me? You can't treat me like one of those dumb ass white boys that you be talking to?"[62] At this point, Clark got up from his chair, and Brown believed that he was going to get Jayvon Turner for him. On direct examination, Brown stated:

A: I'm thinking that we had a break though, like he's going to get up and go get this young boy for me. And then that's when, at first I thought he was punching me. All right. So I'm laughing. And then I seen the blood squirting, and that's when I put my arm up, and I got cut here too.

[MR. WISCHNOWSKI] Q: From the moment that you realized he was punching you, did you change your position from that leaning stance with your hands folded?

A: No, it's just like two or three quick smacks, but there, there was an object in his hand.

Q: Why did you laugh?

A: Because the first initial blow was like, like really? And then, then when I seen the blood squirting[sic] that's when I realized he had something and he was cutting me with something.

Q: Did you try to fight back or have a chance or—

A: No.

Q: --have a chance to fight back?

A: No. I just, like, defended myself. Put my arm up.

Q: And again, is anything in your hand that you lifted?

A: No.

Q: Okay. Now what happened to you after you were struck several times on the left side?

A: I jumped off the porch, fell over the wall face first, and then blood was really coming out, so I took my shirt off and tied it around my neck. And Fred, the resident of the house, come and told me, he said, "Chris, you better go home, because it look kind of bad."

---

[62] Transcript of Record, July 7, 2022, at 66, 1651 of 2022.

Q: Where, so you end up in the street; correct?

A: Correct.

Q: After you realized what had happened, you're bleeding and you're in the street, what did Tyrone do? What did Mr. Clark do?

A: Just a little taunting.

Q: What did he say to you from the porch as you were down in the street?

A: I, I asked, "Why you cut me? What you cut me for," and the words come out of his mouth.

Q: What were they?

A: "I should have killed you."[63]

After Brown's testimony, the Commonwealth and the Defense moved for a

motion for a judgment of acquittal as to all counts:

> MR. SCHMIERER: Your Honor, I would make a motion for judgment of acquittal as to all counts, specifically with respect to the criminal attempt criminal homicide I would argue that the Commonwealth has not produced sufficient evidence, well, that they have not produced sufficient evidence as to all counts, but specifically with respect to the criminal attempt homicide that to kill the victim, which is required.
>
> ...
>
> THE COURT: So there's no question that specific intent to kill can be inferred from the circumstances surrounding the incident and the contact, and in addition to the instruction that Mr. Wischnowski points out to the Court. It's a matter of law that the specific intent to kill may be inferred from the fact that the accused used a deadly weapon to inflict an injury to a vital part of the victim's body.
>
> The Court finds in this case, at least at this time, that the alleged instrument of the crime, a blade, could be considered a deadly weapon and that the area of the body where the injury was inflicted could be determined to be or decided by the jury to be a vital part.

---

[63] *Id.* at 70-72

So, based upon the circumstances of this case and the application of Pennsylvania law, not only for Count 1, criminal attempt at criminal homicide, first degree homicide, the other counts, Count 2, Count 3, Count 4, and Count 5, that would be aggravated assault, simple assault, reckless endangering, and harassment, respectively, the Commonwealth has presented sufficient evidence, at least prima facie evidence, that the jury should consider these charges.[64]

Shortly after William Christopher Brown's testimony, Juror 14 advised the Court's Tipstaff that she may have known the victim thirty years ago when he was in high school. A summary of the discussion relating to this matter is below:

> THE COURT: Okay, so the next thing I need to address, Ms. Marla, the tipstaff, told me that Juror 14 advised her that she may know the victim in the case going back 30 years or so. I believe, right, Miss Marla?
>
> THE TIPSTAFF: Yes.
>
> THE COURT: She reported to her that she did not know him by name, except by Chris, and that's why she may not have reported it. And the way she thinks she knows him is she thinks a friend of hers may have dated him when they were in the ninth grade…What did he say [his age] was? 52 or 53?
>
> MR. WISCHNOWSKI: I think he said 53.
>
> THE COURT: So that's what was reported. And I believe, Miss Marla, did she report to you that she's not even sure if it's the same guy?
>
> THE TIPSTAFF: Yeah, she's not positive. She just wanted everybody to be aware in case.
>
> THE COURT: Mr. Schmierer, do you have any comments?
>
> …

---

[64] *Id.* at 119-122.

MR. SCHMIERER: Your Honor, it's the defense's position that if there is any possibility that the juror could personally know the victim I think that that's extremely prejudicial, especially even if the juror does not know if it's the victim she knows, but she may have an inherent bias present as a result of the fact that she thinks this may be the same person, and if it is, in fact, the same person then I believe it would be improper for her to—

THE COURT: I can tell you it's such a black letter response such as all or nothing response is not acceptable. If there is going to be anything there will be a questioning or a discussion, and, just like in voir dire, if she says, even if I did know him I could still be fair and impartial, there may be no reason to excuse this person. So, I can assure the parties here that there's not going to be such a clear-cut per se, type of ruling on this.

Now, if you want, we will have the tipstaff bring her out here and conduct a colloquy, and even if she does think it's the same person, I will have to decide after I hear from her what to do. Is it the position of the Defendant that you would like to colloquy this particular juror?

MR. SCHMIERER: Yes, Judge.

THE COURT: What is the Commonwealth's position?

MR. WISCHNOWSKI: That's fine if they want to do that. I mean my position is that the rule, like you said, isn't so black and white. It's whether she has a close relationship with this person and that can mean a lot of things. It can also not be a lot of things. So if we need to hear from her.

THE COURT: All right. So what we're going to do is, I'm going to ask the tipstaff to get Juror No. 14 and bring her back out into the courtroom.

...

(WHEREUPON, the juror entered the courtroom).

...

THE COURT: So the record should reflect that Juror No. 14 is in the courtroom. The other jurors aren't. Can you please look at your badge and give me your badge number just for the record?

JUROR NO. 14: 235827.

THE COURT: Okay. So it was brought to my attention by the tipstaff that you had told her some things during the lunch period. Could you tell us what it is that you reported to her?

JUROR NO. 14: I believe that Chris Brown may have dated a girl that I went to high school with, like, eighth to ninth grade that I cheered with...She was a cheerleader that I cheered with.

THE COURT: Okay.

JUROR NO. 14: Actually, like, as it was coming to me during this, like, I had to really think about it hard to put the pieces together on, like.

THE COURT: And so are you sure that the fella that you saw testify as William Brown, was the same fella that may have dated—

JUROR NO. 14: Not 100 percent.

THE COURT: Not 100 percent.

JUROR NO. 14: I think maybe if I saw a young picture, which you probably don't have.

THE COURT: So what you're saying is you can't say for certain that was him?

JUROR NO. 14: Not 100 percent, no.

THE COURT: And how long ago was that?

JUROR NO. 14: I graduated in 1990. So that was 32 years ago I graduated, and that would have been, like, between eighth and ninth grade or ninth and tenth. I'm not sure which one.

THE COURT: So closer to 35 years?

JUROR NO. 14: Yes.

THE COURT: Have you had any other contact with him between then and now?

JUROR NO. 14: No.

THE COURT: Other than that, were you friends with him?

JUROR NO. 14: No, not really.

THE COURT: Okay. So, if it turns out to be him, is there anything about that knowledge of him that you do have, even if it turns to

be him, would it prevent you from continuing in this case to be fair and impartial for both sides?

JUROR NO. 14: No.

THE COURT: Would it impact your evaluation of the facts or circumstances in any way?

JUROR NO. 14: No.

THE COURT: Okay. Would you be able to continue to follow all those instructions that I've given, and all of those rules and laws that I've given you up to this point?

JUROR NO. 14: Yes.

THE COURT: It wouldn't change anything there?

JUROR NO. 14: (Indicates to the negative).

THE COURT: Okay. And have you had any discussions with any of the other jurors about that potential knowledge of that individual?

JUROR NO. 14: No.

THE COURT: All right. And you are the remaining alternate; right?

JUROR NO. 14: Yes.

THE COURT: All right. I'm going to give Mr. Schmierer and Mr. Wischnowski an opportunity if they have any follow-up questions.

MR. SCHMIERER: Good afternoon, ma'am.

JUROR NO. 14: Hi.

MR. SCHMIERER: Where did you go to high school?

JUROR NO. 14: Beaver Falls.

MR. SCHMIERER: And you said that you believe that Mr. Brown dated a friend of yours?

JUROR NO. 14: Yes, I believe so.

MR. SCHMIERER: Where did the friend go to high school.

JUROR NO. 14: She went to Beaver Falls, but then she moved away after that year to New Brighton.

MR. SCHMIERER: When this friend would have dated potentially Mr. Brown, would that have been when she had moved away?

JUROR NO. 14: No. When she went to our school. Like, putting it together in my mind on how, I think it might have been, like, after our games maybe, he might have come down to see her at a basketball, after a basketball game.

MR. SCHMIERER: How often would you say you would have encountered him?

JUROR NO. 14: I couldn't even. It's that fuzzy and that little...I couldn't even tell you how long they might have dated. It's just that it occurred to me that I, I could have known this person at some point in my life, but it was just in passing.

MR. SCHMIERER: Okay. And he wouldn't have gone to your high school to the best of your recollection?

JUROR NO. 14: No. I'm not even sure where he came from or how, maybe Aliquippa. I don't know where he could have come from.

MR. SCHMIERER: Okay. That's all the questions I have. Thank you, ma'am.

THE COURT: Anything, Mr. Wischnowski?

MR. WISCHNOWSKI: No, Your Honor.

...

(WHEREUPON, the juror left the courtroom.)

...

MR. SCHMIERER: Your Honor, for the record obviously, you know, the Court will rule on this issue, it's the Defendant's position that the juror potentially knowing the victim in the case would be the most prejudicial relationship, and I understand it was a very long time ago and I understand that the testimony is such that they didn't have a close relationship, but it could potentially bias this juror.

And being that we have, she is an alternate, we have, it would not cause a mistrial in this case, we would ask that this juror be excused.

...

THE COURT: So, I'll take your position, Mr. Schmierer, to be a motion to strike this juror, and the first part of the analysis does say that there are per se reasons that it should be granted, including, if there is a close familiar relationship. And I don't find such a relationship exists. I don't find that this juror is sure that this is any

kind of relationship, and I understand it is with the victim in the case, but under the circumstances that she's just disclosed, and I also find that there was no intentional hiding of this information by this individual—I just want to state that for the record, too, because I had observed her demeanor. The motion is denied, and your objection is duly noted.[65]

The Defense called Fredrick Turner to testify.[66] Fredrick Turner stated that he has known the Appellant for about sixty years.[67] Tyrone Clark had been staying with him for a few days leading up to September 11, 2021.[68] Turner stated that he told Clark to hang out on the porch on the day of the incident because "a little trouble was coming up there at that time" and Turner wanted to prevent people from coming into the house.[69]

Turner testified that he was familiar with William Chris Brown as his neighbor and had known him for about ten years.[70] Turner was upstairs in his bedroom when the incident on his front porch occurred.[71] Upon being woken up due to the disturbance, Turner went to the porch and saw Chris Brown standing on the front porch between the top and bottom steps.[72] Turner testified that Chris Brown was bleeding but Turner could not

---

[65] *Id.* at 138-147.
[66] *Id.* at 170.
[67] *Id.*
[68] *Id.* at 173.
[69]*Id.*
[70] *Id.* at 174.
[71] *Id.* at 175.
[72] *Id.*

immediately determine what caused Brown's injuries until he began speaking with Brown.[73]

At this point, Turner called the police.[74] He stated that he saw Brown "had something in the back,"[75] he testified that he believed it was something that could be used as a weapon but could not definitively say if it was a knife.[76] When asked why this information was not given to law enforcement, Turner stated that he was not asked to provide a statement but that he would have given one if asked.[77]

The Appellant, Tyrone Clark, was called as the defense's last witness. As to the day of the incident, the Appellant testified that he had been staying at Fredrick Turner's house, and that he knew of Chris Brown during this time, but did not hang out with him or know him well.[78] The Appellant said that he was sitting on the Turner's porch on September 11th. During his testimony, Clark stated, "Freddie told me if anybody come through the house, don't let them in. He was trying to keep all the traffic down, because the task force had blew the door off his house twice."[79]

---

[73] *Id.*
[74] *Id.* at 176.
[75] *Id.* at 177, 178.
[76] *Id.* at 178.
[77] *Id.* at 196.
[78] *Id.* at 202, 203.
[79] *Id.* at 203.

The Appellant was aware that Brown had "ripped off" Jayvon Turner the day before, but insisted that Brown was not coming down to Turner's house to smoke weed "because [Brown is] a crackhead."[80] The Appellant testified that he observed Brown walking down the street with a beer in his hand,[81] stating that once Brown got to the porch, the Appellant informed him that he could not go into the Turner's house. The Appellant testified that he believed Brown was high on crack at this time and that he smelled like he had been drinking.[82] On cross examination, the Appellant stated that he was familiar with the signs of impairment by individual's high on crack cocaine because he was a coordinator at a drug program in the past.[83]

The Appellant testified that Brown was insistent on going in the house, despite being repeatedly told that Fredrick Turner was not allowing visitors.[84] According to the Appellant's testimony, Brown never knocked on the door because the Appellant would not let him.[85] Brown then told the Appellant that he was going in the house anyway, at which point the Appellant got up from his seat.[86] The Appellant stated that when he got off

---

[80] *Id.* at 205.
[81] *Id.*
[82] *Id.* at 218.
[83] *Id.* at 219.
[84] *Id.* at 208.
[85] *Id.*
[86] *Id.* at 209.

the porch chair, he observed Brown reaching behind him.[87] The Appellant testified that he had seen Brown with an "old raggedy knife" in the past, and that he believed Brown was reaching for that knife in order to cut him.[88] The Appellant testified that he became fearful and thought that Brown was going to pull on a knife on him, which is when he cut Brown with a razor.[89]

When the Commonwealth replayed surveillance footage during cross-examination, the Appellant could not identify when Brown headed towards Turner's door, or when Brown reached behind him to grab a weapon, and the footage failed to establish that Brown had been holding a beer on the porch.[90]

When questioned about the jail call that was previously admitted, the Appellant stated that Will Turner had told him Brown stated he would drop the charges in exchange for Will Turner paying him money.[91] The Appellant explained that the Will referred to in the phone call was not William Chris Brown, but in reference to Will Turner.[92]

---

[87] *Id.*
[88] *Id.*
[89] *Id.* at 211.
[90] *Id.* at 207.
[91] *Id.* at 225.
[92] *Id.* at 227.

On July 8, 2022, prior to Jury Instructions being provided to the jury, the court asked if either party was requesting special interrogatories to be included in the verdict slip.[93]

> THE COURT: And the verdict slips, has anybody anticipated requiring any specific interrogatories on the verdict slip? Mr. Wischnowski, usually that requests comes from the Commonwealth because its tied into something.
>
> MR. WISCHNOWSKI: For, let me think. For, for the first two counts, well, actually, for Count 1 and 2, can we have a special interrogatory for deadly weapon used, whether a deadly weapon was used. It affects whether or not we use the basic matrix or the enhanced matrix at sentencing.
>
> THE COURT: Mr. Schmierer?
>
> MR. SCHMIERER: I believe that's appropriate.
>
> THE COURT: Okay.[94]
>
> ...
>
> Question at 2:38p.m.
>
> THE COURT: We are back on the record, and we're in chambers. Today it's July 8[th], and in the case of Commonwealth of Pennsylvania versus Tyrone Clark, the jury is out deliberating and has been so since the lunch hour...I was just provided with a note from the jurors in this envelope. It's been clocked. The note reason, "According to the statue of Commonwealth law, what is the definition of a deadly weapon?" And it's not signed, so I'll turn the original over to the official court reporter, and I'll hear from the parties first, but let me say this: here is the statutory definition of a deadly weapon. The statutory definition is set forth in Title 18, Section 2301, and the general provisions of that particular chapter.
>
> MR. WICSHNOWSKI: My position would just be to instruct them on the generic definition.

[93] Transcript of Record, July 8, 2022, at 4, *Commonwealth v. Tyrone Clark*, 1651 of 2021.
[94] *Id.*

THE COURT: Just for the record, deadly weapon is defined in that section, and a copy of which I've provided to both counsel, as follows: Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury or any other device or instrumentality which in the manner in which it is used or intended to be used is calculated or likely to produce death or serious bodily injury. So the question becomes, when you have a statutory definition of a word that's used in the instruction, the first question is there anything that prohibits me from using that? Mr. Schmierer, what do you think?

MR. SCHMIERER: Judge, without researching the issue, I couldn't tell you if there's anything prohibiting it. I believe if the instruction, as set forth in the standard criminal jury instructions, does not include a definition, which if the Court will recall, other instructions that were read today did include definitions of certain terms, specifically the self-defense instruction did have a definition therein, and it would be my position that the Court would just instruct the jury that the instructions are that which the Court has already provided. If they would like the Court to read those instructions that were already given a second time, then I wouldn't have an issue with that, but to look into the statute and pick out certain definition and then supplement standard jury instructions, I would not, I would object to that.

MR. WISHNOWKSI: I haven't researched this very specific issue, but given that is the general definition contained in the definitions of the statute and it is a defined term, I think it would be helpful to define that term for the jury since they have to deliberate about it. So I don't see any issue with supplementing it, and I'm not aware of any case law that would prohibit supplementing an instruction in this fashion.

THE COURT: I don't believe that providing this information would be misleading. That's the first thing that I would like to say, and with the indulgence of the parties, I called you as soon as I received this, and I didn't have a chance to look this up myself. I have quick access to Westlaw so I'm going to ask just for your patience for a moment while I lookup a few things.

All right. I was aware of the notion, and it's been referred to as a well-settled principle that the standard jury instructions are not themselves binding, do not alter the discretion in me crafting jury instructions, and so given that that is the status of the law and given the clear authority that a trial judge may frame jury instructions and language that deviates from standard instructions, so long as the instruction adequately and accurately defines essential terms, so long as I abide by that polestar, I feel that giving the definition in Section 2301 is something that could very easily have been included in the original instruction and at this point it very well maybe if I have this instruction come up. It doesn't misstate the law or what a deadly weapon is. It doesn't confuse the jury by telling them that this is what it is. They have a specific question, and this is one of those times where it can definitely be answered with exact words. The question can be with, when I say exact words, I mean words straight from what they reference as Commonwealth law.

So my intentions are to read the definition and tell them that this definition was not previously provided to them; however, this is the definition that arises out of Pennsylvania law, which is in something we call Title 18 in Section 2301. I don't like to give too may technical terms, but I think the reference to Pennsylvania law is necessary there.

Mr. Schmierer, if it was misleading or if I thought it wasn't exactly what they were looking for, I would consider your position, but your objection is noted, and we'll give this short definition.[95]

## ISSUES

Appellant's Concise Statement of Matters Complained of on Appeal are as follows (recited verbatim):

---

[95] *Id.* at 97-101.

a) The Commonwealth did not present sufficient evidence to prove the Defendant's guilty beyond a reasonable doubt as to each element of the crime at Count 2, Aggravated Assault as a felony of the first degree.

b) The Commonwealth did not present sufficient evidence to prove the Defendant's guilt beyond a reasonable doubt as to each element of the crime at Count 3, Simple Assault as a misdemeanor of the second degree.

c) The Commonwealth did not present sufficient evidence to prove the Defendant's guilt beyond a reasonable doubt as to each element of the crime at Count 4, Recklessly Endangering Another Person as a misdemeanor of the second degree.

d) The verdict of guilty of the crime at Count 2, Aggravated Assault as a felony in the first degree, is against the weight of the evidence.

e) The verdict of guilty of the crime at Count 3, Simple Assault as a misdemeanor of the second degree, was against the weight of the evidence.

f) The verdict of guilty of the crime at Count 4, Recklessly Endangering Another Person as a misdemeanor of the second degree, is against the weight of the evidence.

g) The Court erred in denying Defendant's motion to strike juror number JL5A-8, because she had a personal belief that if a Defendant were not guilty that the Defendant would testify and she equivocated on her ability to set her personal belief aside and follow the Court's instruction.

h) The Court erred in denying the Defendant's *motion in limine* to introduce the prior *crimen falsi* convictions of the alleged victim under the premise that the Defendant did not provide written notice to the Commonwealth, where the Commonwealth acknowledged providing the criminal record of the alleged victim about a week prior to the trial and the Commonwealth suffered no prejudice from the lack of written notice and had a fair opportunity to contest the use of such evidence.

i) The Court erred in denying the Defendant's *motion in limine* to introduce the prior *crimen falsi* convictions of the alleged victim and this error was because the probative value of allowing this evidence substantially outweighed its prejudicial effect.

j) The Court erred in denying the Defendant's *motion in limine* to preclude the Commonwealth's introduction of a portion of a jail phone call made by the Defendant where the Defendant allegedly made a statement about an unknown third party convincing the alleged victim to drop the charges where its probative value is outweighed by a danger of unfair prejudice confusing the issues, and misleading the jury.

k) The Court erred in denying the Defendant's *motion in limine* to preclude the Commonwealth's introduction of a portion of a jail phone call made by the Defendant where the Defendant allegedly made a statement about an unknown third party convincing the alleged victim to drop the charges because it is an improper use of other crimes, wrongs, or acts evidence offered against the accused by the Commonwealth was insufficient to overcome the balance test in Pa.R.E. 404(b)(2).

l) The Court erred in not providing the jury with a limiting instruction regarding the introduction of the jail recording where the Defendant allegedly made a statement about an unknown third party convincing the alleged victim to drop the charges.

m) The Court erred in permitting the Commonwealth to comment on the Defendant's retention of counsel prior to trial in violation of his rights under the Pennsylvania and United States Constitutions.

n) The Court erred in permitting the Commonwealth's questioning which suggested to the jury that the Defendant has an obligation to assist the Commonwealth in meeting its burden of proof, thus shifting the burden to the Defendant, in violation of his rights under the Pennsylvania and United States Constitutions.

o) The Court erred in permitting the Commonwealth to impermissibly suggest that Defendant and by extension, Defendant's counsel, had an obligation to assist law enforcement in the investigation of the case in violation of his rights under the Pennsylvania and United States Constitutions.

p) The Court erred in overruling the Defendant's objection under the best evidence rule where Officer Bialik was asked to provide his opinion that the alleged victim was standing in a passive or non-threatening way in a video, where the officer did not personally observe the incident.

q) The Court erred in permitting the fact witness, Sabrina Christie, who was not qualified as an expert witness, to testify that a laceration that is 5 centimeters in depth is deep enough to pierce the "platysma muscle."

r) The Court erred in denying the Defendant's motion to strike the juror, for cause, who both notified the Court and testified that she believed she possibly knew the victim in the past.

s) The Court erred in supplementing the jury instruction with the statutory definition set forth in Title 18, Section 2301, for a deadly weapon, where the definition was not contained in the standard criminal jury instruction.[96] [97]

## ANALYSIS

## THE COMMONWEALTH ESTABLISHED BEYOND A REASONABLE DOUBT THAT APPELLANT COMMITTED THE CRIMES CHARGED AGAINST HIM

### SUFFICIENCY AND WEIGHT OF THE EVIDENCE

The Appellant asserts that the Commonwealth did not sufficiently establish that he was guilty of the crime at Count 2, Count 3 and Count 4. In essence, he challenges the sufficiency of the evidence showing that he was guilty of the crimes for which he was convicted; however, the Appellant fails to identify with specificity which elements the Commonwealth failed to establish with sufficiency at trial and the Appellant has thereby waived all sufficiency of evidence claims. In

---

[96] Concise Statement of Matters Complained on Appeal, *Commonwealth of Pennsylvania v. Tyrone Clark*, 1651 of 2022.

[97] "We remind counsel of the importance of expert, focused appellate advocacy. While criminal defendants often believe that the best way to pursue their appeals is by raising the greatest number of issues, actually, the opposite is true: selecting the few most important issues succinctly stated presents the greatest likelihood of success...[T]he number of claims raised in an appeal is usually in inverse proportion to their merit and that a large number of claims raises the presumption that all are invalid. As Judge Aldisert puts it, 'Appellate advocacy is measured by effectiveness, not loquaciousness.'" See *Commonwealth v. Ellis*, 626 A.2d 1137, 1140-41 (Pa. 1993), citing R. Aldisert, "The Appellate Bar: Professional Competence & Professional Responsibility — A View From the Jaundiced Eye of One Appellate Judge," 11 CAP.U.L.REV. 445, 458 (1982).

**Commonwealth v. Bonnett**, 239 A.3d 1096, 1106 (Pa. Super. Ct. 2020), the Superior Court concluded that a sufficiency of evidence claim was waived on appeal where the Appellant in the Concise Statement of Errors pursuant to Pa.R.C.P. 1925(b), stated his intention to question on appeal "[w]hether the[re] was insufficient evidence to sustain a verdict of guilty of each charge in each case." Specifically, the Superior Court concluded "that Appellant's challenge to the sufficiency of the evidence is waived because his Rule 1925(b) statement did not adequately identify the errors that he intended to challenge on appeal." **Id.**

The **Bonnet** Court found that the requirements of Pa.R.A.P. 1925(b)(4)(ii) mandate that a Rule 1925(b) statement must "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." **Id.** (citing from **Pa.R.A.P. 1925(b)(4)(ii)**). Parties to an appeal were put on notice that careful consideration should be given to the preparation of a 1925(b) concise statement because it is "a crucial component of the appellate process" because this is the mechanism in place which "allows the trial court to identify and focus on those issues the parties plan to raise on appeal." **Id.**

Even though the sufficiency claims have been waived, this court will address the claims asserted by the Appellant that every element of the crimes convicted will be addressed.

The standard and scope of review of challenges to the sufficiency of the evidence is well-settled:

> [W]e evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Any doubt about the Appellant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as matter of law, no probability of fact can be drawn from the combined circumstances. Additionally, the Commonwealth may sustain its burden solely by means of circumstantial evidence.[98]

In applying the above test, the entire record must be evaluated and all evidence actually received must be considered. It is left to the fact-finder to judge a witnesses' credibility, resolve conflicts in testimony and weight the evidence.[99] [T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.[100] On

---

[98] *Commonwealth v. Lake*, 281 A.3d 341, 2022 PA Super 142, at *2 (Pa. Super. filed Aug. 15, 2022) (citations and quotations omitted).
[99] *Commonwealth v. Payne*, 868 A.2d 1257 (2005).
[100] *Commonwealth v. Orr*, 38 A.3d 868, 872-73 (Pa. Super. 2011).

review, the court must determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[101]

The Appellant attacks the sufficiency of the evidence supporting his conviction of aggravated assault. Likewise, the Appellant also raises a sufficiency of the evidence claim to the crimes of Reckless Endangering Another Person and Simple Assault. As stated in *Commonwealth v. Cianci*, "a conviction for aggravated assault requires a person, under circumstances manifesting extreme indifference to the value of human life, to (1) attempt to cause serious bodily injury to another, or (2) cause such injury intentionally, knowingly or recklessly. By contrast, to commit [Reckless Endangering Another Person ("REAP")], a person must recklessly engage in conduct which places or may place another person in actual danger of death or serious bodily injury… Additionally, unlike aggravated assault, REAP requires the element of actual danger of death or serious bodily injury. An individual could attempt to cause serious bodily injury to another person without placing that person in actual danger, which would support a conviction for aggravated assault but not REAP."[102]

Lastly, the Appellant argues that the Commonwealth failed to provide sufficient evidence for a conviction of simple assault. "A conviction for simple

---

[101] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).
[102] *Com. v. Cianci*, 130 A.3d 780, 782–83 (Pa. Super. Ct. 2015)

assault requires the Commonwealth to establish that a defendant caused, or attempted to cause, bodily injury to another person."[103]

In addition to challenging the sufficiency of the evidence, the Appellant also claims that the verdicts for Count 2, Count 3 and Count 4 are against the weight of the evidence. In **Commonwealth v. Lord**, 553 Pa. 415, 719 A.2d 306 (1998), the Pennsylvania Supreme Court held that issues not included in a Pa.R.A.P.1925(b) statement are deemed waived on appeal. In that case, the Court noted the purpose of Rule 1925(b) as being aid to trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. The general statement that the verdict was against the weight of the evidence without identifying a specific weight issue is too vague to allow the court to identify the issues raised on appeal.

In order for the trial court to address the weight of evidence claim as stated, it would have to guess what issue or issues the Appellant is appealing. This the trial court is not required to do. As stated in **Commonwealth v. Dowling**, 778 A.2d 683, 686 (Pa. Super. 2001), "a concise statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no concise statement at all."

> In order to preserve a challenge to either the sufficiency or weight of the evidence on appeal, an appellant's Rule 1925(b) concise statement must state with specificity the elements or verdicts for which the appellant alleges that the evidence was insufficient or against the weight of the

---

[103] *Commonwealth v. Jenkins*, 96 A.3d 1055 (Pa. Super. 2014).

evidence. **See Commonwealth v. Freeman**, 128 A.3d 1231, 1248-[12]49 (Pa. Super. 2015) (finding waiver of appellant's sufficiency and weight challenges where the Pa.R.A.P. 1925 statement was too vague to permit the court to identify (1) which crimes, or the elements of any crimes, that the Commonwealth allegedly failed to prove beyond a reasonable doubt; or (2) which verdicts were contrary to the weight of the evidence, *and the specific reasons why the verdicts were contrary to the weight of the evidence*). Such specificity is of particular importance in cases where [the appellant] was convicted of multiple crimes, each of which contains elements that the Commonwealth must prove beyond a reasonable doubt.

**Commonwealth v. Juray**, 275 A.3d 1037, 1048 (Pa. Super. 2022) (emphasis added).

Appellant has failed to comply with Rule 1925(b) and this court has concluded that Appellant's weight of the evidence issues as stated in the 1925(b) Concise Statement are too vague to permit review of that issue by the trial court and have therefore been waived. The Rule 1925(b) statement raise a weight of evidence claim that merely contained boilerplate language which is too vague to allow the court to identify the issues raised on appeal.

Even though the weight of evidence claims have also been waived, those claims will also be addressed.

"The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses."[104] A court may not substitute its own judgment for that of the trier of

---

[104] *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (quotations omitted).

fact.[105] "Resolving contradictory testimony and questions of credibility are matters for the finder of fact."[106]

"In order for an Appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court."[107] When ruling on a weight claim, the trial court must determine whether "certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice." *Commonwealth v. Holt*, 273 A.3d 514, 532 (Pa. 2022), cert. denied sub nom. Holt v. Pennsylvania, 22-5463, 2022 WL 16542034 (U.S. Oct. 31, 2022) (citation omitted).

In the case before us, the Appellant attacks the sufficiency of the evidence underpinning his convictions on identical grounds as those that were alleged in his weight of evidence claim. In particular, the Appellant alleges that the Commonwealth presented insufficient evidence to establish, beyond a reasonable doubt, that Tyrone Clark assaulted William Brown on September 11, 2021.

These claims, as developed by the Appellant, are asserted with the backdrop consisting of evidence that includes testimony from the victim, William Christopher Brown, who identified Tyrone Clark as the man who caused his injuries at trial.

---

[105] *Id.*

[106] *Commonwealth v. Delmonico*, 251 A.3d 829, 837 (Pa. Super. 2021). See id. (citing Talbert, 129 A.3d at 545).

[107] *Talbert*, 129 A.3d at 545 (internal quotation marks and citations omitted).

Brown provided testimony stating the Appellant cut him while they were both on Fredrick Turner's front porch.

The Commonwealth also offered testimony from the responding police officer, Officer Bialik, who testified that his immediate concern when he first encountered the victim was to get him to the hospital because he might die.

Evidence involving camera footage of the altercation was also admitted; that surveillance footage showed the Appellant and the victim standing on the porch in a manner consistent with the testimony provided by Brown. This footage also depicted the Appellant leaping towards the victim and the victim fleeing the scene. Photographs of the subsequent blood trail leading from Turner's porch, past several parked cars and down Beaver Road were also admitted into evidence.

Brown's treating physician also testified, and explained that upon seeing the laceration to the victim's throat, her immediate priority was to prevent him from dying. During her testimony, she explained that Brown was admitted to the trauma unit as a Level 1 trauma patient, nothing he was "actively bleeding in a life-threatening way."[108]

Furthermore, the Appellant took the stand and stated that he had in fact cut William Christopher Brown with a razorblade while they were both on Fredrick Turner's porch.

---

[108] Transcript of Record, July 6, 2022, at 182, *Commonwealth of Pennsylvania v. Tyrone Clark*, 1651 of 2021.

The Commonwealth provided sufficient evidence to prove that the Appellant acted with the specific intent to cause the victim serious bodily injury. The weight of the evidence provided by the Commonwealth in this case was sufficient to support a guilty conviction of the Appellant as to Count 2, Count 3 and Count 4. This court, under these facts, cannot find that the evidence of guilt was so tenuous, vague and uncertain that the verdict shocks the conscience of the court. Therefore, the weight of the evidence claims, if not deemed to be waived, were properly denied

## THE COURT DID NOT ERR IN DENYING THE DEFENDANT'S MOTION TO STRIKE POTENTIAL JUROR NUMBER JL5A-8 AND JUROR 14

Next, the Appellant argues that the court erred in denying the Defendant's motion to strike a juror because she had a personal belief that if a Defendant were not guilty that the Defendant would testify. The Appellant argues that the juror used ambiguous language on her ability to set her personal belief aside and follow the court's instruction.

The issue raised by the Appellant stems from Juror Number JL5A-8 changing an answer on her questionnaire, which asked if the juror would have a problem following the court's instructions that a defendant in a criminal case does not have to take the stand or present evidence, and that remaining silent and presenting no evidence cannot be held against the defendant.

The Juror had answered "no," but her questionnaire indicated that the Juror may have checked "yes" originally. When asked about changing her answer, the Juror said that she would want to tell her side of the story if she were a defendant in a criminal case, but that she had no issues following the court's instructions. The Commonwealth proceeded to rehabilitate the potential juror, and she confirmed that she would be to follow the court's instructions.

Similarly, the Appellant argues that the court erred in denying their motion for cause in dismissing Juror 14. This claim arises from this Juror disclosing to the court that there was a possibility she had been familiar with the victim thirty-five years ago. This Juror explained that William Brown may have dated a teammate of hers in high-school, but she was unable to confirm if the victim was that same person.

On appeal, challenges involving a motion to strike jurors for cause are subject to the following test:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or

demonstrates a likelihood of prejudice by his or her conduct and answers to questions.[109]

When a juror demonstrates a likelihood of prejudice by conduct or answers to questions, the standard of review "must depends upon the answers and demeanor of the potential juror as observed by the trial judge and[,] therefore[,] reversal is appropriate only in the case of palpable error."[110]

We will first apply the above test to Juror No. JL5A-8. Here, the potential Juror repeatedly stated that she would be able to following the court's instructions and confirmed she would be able to set aside her desire to provide testimony if she were a defendant in a criminal proceeding. There is no evidence of palpable error in the court's decision to deny the motion to strike this juror. It should also be noted that the Appellant in this case did eventually take the stand in his own defense, which ultimately eliminated the main concern defense counsel when raising this motion to strike.[111] Therefore, the court did not err in denying the defense's motion to strike Juror No. JL5A-8.

As to Juror 14, the court determined that any possible relationship between the victim and juror was too remote to qualify her for disqualification under the

---

[109] *Commonwealth v. Bridges*, 563 Pa. 1, 757 A/2d 859, 873 (2000) (citing *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293 (1996)).

[110] *Commonwealth v. Johnson*, 299 Pa.Super. 172, 445 A.2d 509, 512 (1982) (quoting *Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326, 328 (1972)).

[111] By Mr. Schmierer, "My concern is that the amount of detail that she gave in describing her belief that somebody would necessarily have to give their account of the incident would bias her to an extent that if Mr. Clark decides, and again he may decide to testify, but if he decides not to testify, that she may hold that against the Defendant merely because of her personally held belief. So, for that reason, I did raise that cause motion." Transcript of Record, July 5, 2022, at 60, *Commonwealth of Pennsylvania v. Tyrone Clark*, 1651 of 2022.

Page 55 of 83

statute. The juror could not confirm with certainty that the victim was the same person she was acquainted with in high school, and if it was the same person, she had not seen or spoken to him in thirty-five years. She explained that she had not recognized his name on the witness list, and that the possibility that this might be the person who dated her friend did not cross her mind until the victim's testimony was completed. This juror was able to verify that this possible connection would not prevent her from being fair in this case to be fair and impartial to both sides, nor would it impact her evaluation of the facts and circumstances in any way. She confirmed she would be able to continue to follow all the instructions given to her by the court. In consideration of Juror 14's testimony, the court was correct in denying the Appellant's motion to strike Juror 14.

### THE COURT WAS CORRECT IN DENYING THE DEFENDANT'S MOTION IN LIMINE TO INTRODUCE EVIDENCE OF VICTIM'S PAST CONVICTIONS

The Appellant next argues that the court erred in denying the Defendant's motion in limine to introduce prior crimen falsi convictions of the victim, William Christopher Brown. Point (h) of the Appellant's Concise Statement claims that the court erred in denying this motion "under the premise that the Defendant did not provide written notice to the Commonwealth;" under Point (i) the Appellant states "this error was because the probative value of allowing this evidence substantially outweighed its prejudicial effect." Both issues will be addressed in this section.

During pretrial discussions, the defense provided dockets and criminal information related to two cases involving William Christopher Brown; a guilty plea involving theft by unlawful taking from 2006, and a conviction of theft by unlawful taking from 2003.[112] Upon introducing this evidence in his motion, Attorney Schmierer stated the following:

> "Judge, and I can show Mr. Wischnowski [the Commonwealth] what I have if he's agreeable to submitting these. For the first case which is captioned as, I believe it's, it's captioned as 3157 of 2002, as a result of the fact that the docket was migrated from this being an older case, the information was unavailable to access on Infocon. However, I do have what is a petition for hearing on a violation of probation that was filed by the district attorney, and it does articulate that on January 29, 2003, the Defendant entered a plea of guilty to a charge of theft by unlawful taking as a misdemeanor of the second degree. If the Commonwealth is willing to stipulate that that's the case, I can offer that to the Court as proof that the alleged victim did, in fact, enter a plea of guilty to theft by unlawful taking."[113]

There is no indication in the record that notice of the intention to introduce this evidence was provided to the Commonwealth prior to the motion in limine; however, the Commonwealth had no objection to the Criminal Information being admitted into pretrial evidence.

In ruling on the admissibility of crimen falsi convictions, the Superior Court of Pennsylvania has utilized weighing the following factors:

> In making this determination, the following factors should be considered: 1) the degree to which the commission of the prior

---

[112] Transcript of Record, 7/06/22, at 19, *Commonwealth v. Tyrone Clark*, 1651 of 2021. *See also* Pretrial Exhibit A and B.

[113] *Id.* at 17

offense reflects upon the veracity of the defendant-witness; 2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; 3) the age and circumstances of the defendant; 4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and 5) the existence of alternative means of attacking the defendant's credibility.[114]

The court touched on all of these factors in some capacity in its findings on this motion in limine. In its finding, the court stated that while these two convictions involved dishonesty, they were over ten years old and the probative value of the evidence was substantially outweighed by the prejudicial effect. Further, there were other available means to impeach this witness.

The Appellant goes on to say that the Commonwealth "suffered no prejudice from the lack of written notice and had a fair opportunity to contest the use of such evidence." While the court noted the timing and notice provided to the Commonwealth in its findings, there were other factors considered that supported the denial of this motion in limine. However, it is undeniable that Rule 609 includes a timing requirement:

---

[114] *Com. v. Palo*, 2011 PA Super 136, 24 A.3d 1050, 1056 (2011) (citing *Commonwealth v. (Montez) Harris*, 884 A.2d 920, 925 (Pa.Super.2005)).

Pa.R.E. 609, which governs the admission of impeachment evidence, provides as follows:

**Rule 609. Impeachment by evidence of conviction of crime**

...

**(b) Time limit**. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the ocurt determines, in the interests of justice, that the probative value of the conviction substantially outweighs its prejudicial effect. However, **evidence of a conviction more than ten years old as calculated herein is not admissible unless the proponent gives to the adverse party sufficient written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.**[115]

The Appellant claims that the Commonwealth "acknowledged providing the criminal record of the alleged victim about a week prior to trial" and that they suffered "no prejudice from the lack of written notice." While it could be argued that the Commonwealth was not prejudiced by the lack of written notice on the part of the Appellant, that is not a factor to be considered under the plain language of the rule.

In consideration of the foregoing, the court was correct in its ruling for the denial of the introduction of crimen falsi evidence of the victim.

## ADMISSION OF JAIL CALL AND JURY INSTRUCTION

Appellant next claims that it was error to admit a jail calls in which the Appellant was a participant. The jail call at issue contained comments made by the

---

[115] *Commonwealth v. Palo*, 24 A.3d 1050, 1056 (Pa. Super. 2011), emphasis added.

Appellant demonstrating his attempts to influence a witness to perjure himself by minimizing the Appellant's role in the razor attack, all in an effort to clear the Appellant. Specifically, the Appellant requested the other person on the call to "[T]alk to Will because Will's supposed to give the boy something to drop the charges." That portion of the call ended by the Appellant telling the other caller that, in order for his scheme to work, was "like the only way he can drop the charges is if he [the boy] says he had a knife."[116]

It was clear that the Appellant was attempting to get the witness to lie at trial about who possessed a knife and he also attempted to put together a payoff to accomplish that feat. Trial counsel objected to the admission of this evidence at trial. This court ruled that the evidence was admissible to demonstrate the Appellant's consciousness of guilt and the evidence was not to be admitted for demonstrating that the appellant engaged in any illegal conduct outside of the allegations made in the instant case.[117]

> "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Drumheller*, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting *Commonwealth v. Stallworth*, 566 Pa. 349, 363, 781 A.2d 110, 117 (2001)); *Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super.2013). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of

---

[116] Transcript of Record, July 6, 2022, at 22, *Commonwealth v. Clark*, 1651 of 2021.
[117] *Id.* at 111.

judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record."[118]

Appellant claims that the admission of this evidence was "an improper use of other crimes, wrongs, or acts evidence offered against the accused."[119] The trial court clearly admitted this as being relevant to demonstrate Appellant's consciousness of guilt. The recording suggests that Appellant was engaged in some effort to prevent or discourage the victim from testifying against him in a truthful manner.

Our Supreme Court has explained, "all relevant evidence, *i.e.*, evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility."[120] Moreover, "all relevant Commonwealth evidence is meant to prejudice a defendant [and] a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration[.]"[121]

An exception to this rule is that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1).

---

[118] *Commonwealth v. Tyson*, 119 A.3d 353, 357–58 (Pa.Super.2015) (en banc) (quoting, *Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa.Super.2005), appeal denied, 593 Pa. 726, 928 A.2d 1289 (2007)).
[119] Appellant's Concise Statement of Matters Complain of on Appeal, ¶8(l)
[120] *Commonwealth v. Dillon*, 925 A.2d 131, 136 (Pa. 2007).
[121] *Commonwealth v. Dula*, 262 A.3d 609, 633 (Pa. Super. 2021) (citation omitted).

Evidence may be admissible for a purpose other than to show criminal propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2).

"Evidence of prior bad acts may also be introduced to prove consciousness of guilt, *i.e.*, that the defendant was aware of his wrongdoing."[122] Even where an exception to Rule 404(b)'s prohibition against evidence of prior bad acts applies, the evidence is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 (comment).

Pennsylvania courts long recognized that any attempt by an appellant to interfere with a witness's testimony is admissible to show appellant's consciousness of guilt.[123] In that case, the action of the appellant in threatening one witness and attempting to influence another witness to concoct an alibi were found to be permissible evidence of consciousness of guilt.[124]

"[T]he only offer I had was those guys [defendants]. These people offered me $5,000.00 not to come to court."[125] This statement, made by a witness, was deemed admissible based on that court's acknowledgement that "testimony

---

[122] *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016) (citation omitted).
[123] *Commonwealth. v. Rega*, 593 Pa. 659, 681, 933 A.2d 997, 1009 (2007).
[124] *Id.*
[125] *Commonwealth v. Johnson*, 542 Pa. 384, 398, 668 A.2d 97, 104 (1995).

regarding attempts by a defendant in a criminal prosecution to interfere with witnesses is admissible to show the defendant's consciousness of guilt.[126] In *Commonwealth v. Lark*,[127] evidence of threats made by the appellant to a witness was deemed to be "admissible as such evidence constituted admissions by conduct showing consciousness of guilt. In this case, in clear language, the appellant desperately tried to alter the story that the victim would tell to the jury. His efforts were unsuccessful and what was revealed through his own words in the telephone recording was Mr. Clark's own consciousness of guilt.

The Appellant also claims that the trial court erred in not providing a limiting instruction regarding the introduction of the jail recording. No such instruction was requested at the time that the recording was played or when points for charge were to be submitted and, no objection was made to the final charge that did not include a limiting instruction.

Therefore, this particular challenge has been waived.[128] Pa.R.A.P 302(a) requires an appellant to make a timely and specific objection at trial or face waiver of his issue on appeal. Pa.R.A.P. 302(a). "Failure to request a cautionary

---

[126] *Id.*
[127] *Commonwealth v. Lark*, 518 Pa. 290, 308, 543 A.2d 491, 500 (1988)
[128] Transcript of Record, July 6, 2022 at 113, *Clark*, 1651 of 2021.

instruction upon the introduction of evidence constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction."[129]

The record reveals that appellant presented this issue for the first time in his Rule 1925(b) statement. It is well settled that issues not raised in the lower court are waived and cannot be raised for the first time on appeal.[130] Moreover, a party cannot rectify the failure to preserve an issue by raising it for the first time in a Rule 1925(b) statement.[131]

## THE APPELLANT'S CLAIM THAT THE COURT PERMITTED THE COMMONWEALTH TO COMMENT ON DEFENDANT'S RETENTION OF COUNSEL PROVIDED LITTLE GUIDANCE FOR THIS COURT TO CONDUCT A MEANINGFUL REVIEW

In point (m) the Appellant's Concise Statement, the Appellant argues: "The Court erred in permitting the Commonwealth to comment on the Defendant's retention of counsel prior to trial in violation of his rights under the Pennsylvania and United States Constitutions."[132] Despite multiple reviews of the trial transcripts in its entirety, this statement is too vague for this court to identify, with absolute certainty, when this alleged comment occurred on the part of the Commonwealth.

---

[129] *Commonwealth v. Bryant*, 579 Pa. 119, 141, 855 A.2d 726, 739 (2004) (citing *Commonwealth v. Wallace*, 522 Pa. 297, 561 A.2d 719 (1989) (holding trial counsel's failure to object, when trial court did not issue cautionary instruction following introduction of evidence of defendant's prior incarceration, resulted in waiver of any claim of error based upon trial court's failure to give a cautionary instruction); *Commonwealth v. Jones*, 501 Pa. 162, 460 A.2d 739 (1983) (deeming issue waived where defense counsel immediately objected to prosecutor's conduct but failed to request mistrial or curative instructions).

[130] *Commonwealth v. Watson*, 835 A.2d 786, 791 (Pa. Super. 2003); see also Pa.R.A.P. 302(a).

[131] . See *Commonwealth v. Pi Delta Psi, Inc.*, 211 A.3d 875, 884 (Pa. Super. 2019) (stating "issues, even those of constitutional dimension, are waived if not raised in the trial court.")

[132] Appellant's Concise Statement of Matters Complain of on Appeal, ¶8(m)

Raising clear and precise issues is a paramount pillar to the 1925 opinion process. In *Commonwealth v. Lord,* the Supreme Court of Pennsylvania spearheaded vague issues raised on appeal, reasoning:

> The absence of a trial court opinion poses a substantial impediment to meaningful and effective appellate review. Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process."[133]

The court in Lord was addressing general situations where an appellant completely fails to mention an issue, however this point was extended to "Concise Statements which are so vague as to prevent the court from identifying the issue to be raised on appeal" by the Pennsylvania Superior Court:[134]

> When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review. When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues. In other words, a[c]oncise [s]tatement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.[135]

For the reasons explained above, this court feels that providing an analysis on an issue this unclear would amount to guessing on the part of the court. This

---

[133] *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 308 (1998).
[134] *Commonwealth v. Dowling,* 778 A.2d 683, 686 (Pa.Super. 2001).
[135] *Commonwealth v. Reeves,* 907 A.2d 1, 2 (Pa.Super.2006).

court is unable to provide a meaningful review as to the issue raised in point (m) of the Appellant's Concise Statement.

## THE COMMONWEALTH DID NOT SUGGEST THAT THE DEFENDANT HAD A DUTY TO ASSIST THE COMMONWEALTH IN MEETING ITS BURDEN OF PROOF, AND/OR ASSIST THE LAW ENFORCMENT IN THEIR INVESTIGATION

The next points raised by the Appellant are as follows:

n)     The Court erred in permitting the Commonwealth's questioning which suggested to the jury that the Defendant has an obligation to assist the Commonwealth in meeting its burden of proof, thus shifting the burden to the Defendant, in violation of his rights under the Pennsylvania and United States Constitutions.

o)     The Court erred in permitting the Commonwealth to impermissibly suggest that Defendant and by extension, Defendant's counsel, had an obligation to assist law enforcement in the investigation of the case in violation of his rights under the Pennsylvania and United States Constitutions.

Point (n) has similar vagueness issues addressed in the section above regarding the analysis for point (m); it's unclear when the Commonwealth suggested that the Defendant has an obligation to assist the Commonwealth in meeting its burden of proof. This court assumes the Appellant is referencing redirect testimony of the Commonwealth's witness, Officer Bialik. The redirect testimony is relevant to the issue raised in point (o) and will be addressed here as well.

During the Commonwealth's initial line of questioning, Officer Bialik was asked about his observations as responding officer on September 11, 2021, as well as his role in the investigation as the affiant and investigating officer.

On cross-examination, counsel for the Appellant asked a series of questions related to Officer Bialik's training and experience as an affiant, as well as his process in interviewing witnesses to crimes. Appellant on cross examination also asked Officer Bialik about the inclusion of interviews of a defendant during his investigations. It should be noted that whether or not the Appellant made a statement to police was a question presented by the Defense in their cross-examination of Officer Bialik. Retention of counsel was not an issue touched on or included in the Commonwealth's direct-examination or redirect, as noted in the analysis for the section above. Moreover, the question initially posed by Attorney Schmierer regarding the officer receiving a statement from the Appellant included no limiting time-frame, meaning it was not clear if he was asking the officer if he sought a statement before or after the Appellant retained counsel for trial.

After a sidebar concluded, the Commonwealth's re-direct of their witness, Officer Bialik, continued:

> MR. WISCHNOWSKI: Thanks, Your Honor. Officer Bialik, I was asking you about your communications, just in general, with defense attorneys with the cases that you conduct, the investigations that you lead. Do you know pretty much every criminal defense in this county?

BIALIK ["A"]: I know a lot of them I would say. Yeah, I know a lot of them.

MR. WISCHNOWSKI ["Q"]: Do you communicate with them almost every day or at least every week?

A: Honestly, no. I hardly ever. Minus a few, I hardly ever speak to them.

Q: If a defense lawyer reached out to you to ask you some questions about your investigation, would you make yourself available up until the time of trial?

A: If someone called, yes.

Q: Did anybody on Mr. Clark's behalf reach out to you to ask you some of those clarifying questions?

MR. SCHMIERER: I'm going to renew my objection, Your Honor.

THE COURT: Overruled.

BY MR. WISCHNOWSKI:

Q: The question is, did Mr. Schmierer or any counsel or Mr. Clark ever reach out to you to ask you to clarify some of those things you were asked about?

A: No.[136]

We disagree that this line of questioning was the Commonwealth's attempt to shift the burden of proof to the defense. We also do not agree that this line of questioning implied that the Defendant, and by extension, the Defendant's counsel, had an obligation to assist law enforcement in their investigation, as argued by the Appellant. Conversely, the court viewed this line of questioning as the Commonwealth's attempt to rehabilitate their witness after the defense challenged the thoroughness of the criminal investigation.

---

[136] Transcript of Record, July 6, 2022, at 140-141, *Commonwealth v. Clark*, 1651 of 2021.

The case law on this issue is clear. In a criminal trial, a suggestion that a defendant has a duty or obligation to produce evidence *may* infringe on the defendant's constitutionally-protected presumption of innocence in violation of his fair right to trial.[137] A statement from which the jury can draw an adverse inference from the defendant's failure to produce evidence will violate a defendant's constitutionally-protected right to be presumed innocent.[138] However, as stated by the Supreme Court of Pennsylvania in *Commonwealth v. Sneed*, a comment from the Commonwealth concerning a defendant's failure to produce evidence does not violate a defendant's right to a fair trial when the statements are in response to "defense counsel's argument" or a "theory espoused by the defense[.]"[139] Additionally, our Supreme Court has found that suggesting "weaknesses regarding the defense's proffered evidence" does not amount to an improper shift of the Commonwealth's burden to procedure evidence.[140]

In the case at hand, the Commonwealth's comments were made in response to allegations advanced by the defense in their cross-examination of Officer Bialik, where the defense attempted to theorize about the completeness of his investigation as lead investigating officer and affiant. If anything, the Commonwealth was able

---

[137] Commonwealth v. Miller, 208 A.2d 867, 869-71 (Pa. 1965).
[138] *Id.* at 870.
[139] *Commonwealth v. Sneed*, 45 A.3d 1096, 1112 (Pa.2012).
[140] *Thomas v. Pennsylvania*, 134 S.Ct. 173, 187 (U.S.2013)

to establish that it would be out of the ordinary for an investigating officer to speak with defense counsel in the course of their investigation.

> MR. WISCHNOWSKI ["Q"]: Do you communicate with [defense attorneys] almost every day or at least every week?
>
> A: Honestly, no. I hardly ever. Minus a few, I hardly ever speak to them.

Since the door was open in regard to the thoroughness of Officer Bialik's investigation during cross examination by trial counsel, the court was correct in permitting this line of questioning over the defense's objections.

Likewise, although point (m) is vague as to what line of questioning the Appellant is referring to, the court does not believe it was implied that the Defendant had an obligation to assist the Commonwealth in meeting its burden of proof during this line of questioning. Additionally, this argument fails in light of the jury instructions read on July 8, 2022:

> "And so, to summarize, you may not find the Defendant guilty based upon mere suspicion of guilt. The Commonwealth has the burden of proving the Defendant guilty beyond a reasonable doubt. If it meets that burden, then the Defendant is no longer presumed innocent, and you should find him guilty. On the other hand, if the Commonwealth does not meet its burden, then you must find him not guilty."[141]

For the reasons stated above, the Commonwealth's line of questioning did not violate the Appellant's rights under the Pennsylvania Constitution or the United States Constitution.

---

[141] Transcript of Record, July 8, 2022, at 62, *Commonwealth v. Clark*, 1651 of 2022.

# BEST EVIDENCE CLAIM

The Appellant argues that the court erred in overruling the Defendant's objection under the best evidence rule, specifically stating that the "Court erred in overruling the Defendant's objection under the best evidence rule where Officer Bialik was asked to provide his opinion that the alleged victim was standing in a passive or non-threatening way in a video, here the officer did not personally observe the incident."[142] The Appellant argues that the since the officer only viewed the surveillance footage, the objection should have been sustained under the best evidence rule. This line of questioning occurred during the Commonwealth's redirect of Officer Bialik. The relevant portions are as follows:

BY MR. SCHMIERER:

Q: All right. Just a few final questions, Officer Bialik. Now, we didn't see in the video that you had gone back to retrieve that surveillance video, but you did that at a later time?

A: Yeah. It was e-mailed to me.

Q: It was e-mailed to you?

A: Yes.

Q: Okay. And that was from a Ms. Brown?

A: Yes.

Q: And you're familiar with Brown as being a neighbor of Fred Turner's?

A: Yes.

Q: Okay. And I think you testified maybe that you had occasion to speak with her in the past and obtain video from her house on other investigations?

---

[142] Appellant's Concise Statement of Matters Complain of on Appeal, ¶8(p)

A: Yes.

Q: Okay. And so I guess subsequent to that day is when you would have received that video by e-mail?

A: Excuse me?

Q: You would have gotten that video later by e-mail?

A: It would have been very, I want to say, like, when you see me enter the police station, at the very end of my body camera, it should have been because you see me walking up and talking to Mrs. Brown. She's looking through and trying to figure out how to e-mail to me. By the time I got back to the station, she had probably e-mailed it to me by then.

Q: Okay. And did you have it before you filed your total Complaint?

A: Yes.[143]

...

[BY MR. WISCHNOWSKI:]

Q: Now, you got to watch the video that Mr. Schmierer referenced of the surveillance camera footage; correct?

A: Yes.

Q: That was provided to you by Jacque Brown?

A: Yes.

Q: And you watched it before you filed the charges; correct?

A: Yes.

Q: Did that impact the way that you filed the charges and the decisions that you made when you prepared your Criminal Complaint?

A: Yes.

Q: How did it influence you? Well, let me ask it to you this way. How many people were in that footage?

A: Two.

Q: And were you able to identify them easily?

A: Yes.

---

[143] Transcript of Record, July 6, 2022, at 133-135, 1651 of 2021.

Q: Who were they?

A: It was Christopher Brown, William Christopher Brown, and the Defendant.

Q: Why weren't you concerned that Mr. Brown might have raised a knife before the Defendant raised his knife?

A: His, it appeared he had his arms crossed. I don't want to, we'll say, you couldn't really see arm, but you could see he was in a non-threatening manner—

MR. SCHMIERER: Your Honor, I'm going to object at this point. I think that we're discussing the video that we've, that hasn't been admitted into evidence at this point, and obviously the video is the best evidence of what is being discussed.

THE COURT: Overruled.

MR. WISCHNOWSKI. Thank you. So, you were explaining that Mr. Brown was standing in a nonthreatening way. How was the beginning of the video, how was Mr. Clark portrayed in that video?

A: Passive. If I had to describe him, he was lounging.[144]

The trial transcript shows this line of question was in response to cross-examination of Officer Bialik by Attorney Schmierer. The purpose of this re-direct was to establish the completeness of Officer Bialik's investigation of the incident and to provide context to the charges Bialik included in the criminal information. The testimony as to what the officer noticed in the video was in response to a question as to what impact his observation of the video had on the charges that he filed. His explanation of what he observed was not comment on the video so much as his explanation as what he reviewed to formulate the charges that were included in the Complaint.

[144] Transcript of Record, July 6, 2022, at 141-143, *Commonwealth v. Clark*, 1651 of 2021.

The Commonwealth did not directly ask if the victim was standing in a non-threatening way, they asked why the investigating officer was not concerned that the victim had raised a knife before the Defendant raised his. Once again, this question must be read in the context of the original question that was asked of the office, namely, what he observed in the video which led to his filing of charges against the Appellant. Moreover, it was the Appellant who was described as standing in a "passive" manner, not the victim.

A 2022 Superior Court case, *Commonwealth v. Abrams*, addressed best evidence rules as applied to surveillance video:

> Pursuant to Rule 1002, known as the "best evidence rule" under common law, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise." Pa.R.E. 1002.

> Although the best evidence rule is traditionally applied only to writings, "[s]urveillance videotapes 'present the same type of circumstances which the best evidence rule was designed to guard against,' namely testimony about the content of a videotape when the original tape has not been produced or admitted." Commonwealth v. Green, 162 A.3d 509, 518 (Pa. Super. 2017), citing Commonwealth v. Lewis, 623 A.2d 355, 358 (Pa. Super. 1993) (first case to apply best evidence rule to videotape evidence).

> While testimony to prove content is inadmissible if neither **an original nor a duplicate is introduced**, "[a] duplicate is admissible[,] to the same extent as the original[,] unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Pa.R.E. 1003.[145]

---

[145] *Commonwealth v. Abrams*, 272 A.3d 483 (Pa. Super. Ct. 2022), emphasis added.

Here, the actual surveillance footage was played for the jury on the same day as Officer Bialik's testimony. This evidence was introduced when the Commonwealth's next witness, Jacque Brown, was called to testify. [146] Jacque Brown was able to authenticate that the video was generated from surveillance cameras on her property. The authenticity of the surveillance footage was not objected to during her testimony.

> Rule 1002 is applicable only in circumstances where the contents of the writing, recording or photograph are integral to proving the central issue in a trial.... Consequently, if the Commonwealth is introducing a writing, recording, or photograph at trial, Rule 1002 requires that the original be introduced only if the Commonwealth must prove the contents of the writing, recording or photograph to establish the elements of its case." Commonwealth v. Fisher, 764 A.2d 82, 88 (Pa.Super. 2000). "The rule is not implicated just because evidence is relevant;" **the rule applies if the writing, recording, or photograph is necessary to prove the elements of a case**. Id. at 381. In other words, the content of **the video must be material to, and not just mere evidence of**, the issues at bar for the best evidence rule to apply. Lewis, supra at 358. "If the **Commonwealth does not need to prove the content of the writing or recording to prove the elements of the offense charged**, then the Commonwealth is not required to introduce the original writing or recording." Commonwealth v. Dent, 837 A.2d 571, 590 (Pa.Super. 2003).[147]

In the case at hand, the Commonwealth did not need the surveillance video in order to prove the elements of the charges against the defendant. Nonetheless, case law establishes that a violation of the best evidence rule is subject to the

---

[146] See Commonwealth's Exhibit 8
[147] Commonwealth v. Green, 2017 PA Super 140, 162 A.3d 509, 518–19 (2017)

"harmless error test."[148] Not every violation will rise to the level of reversible error in every case where there is a true violation.[149] "An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict."[150] The Commonwealth bears the burden of establishing that the error was harmless; this burden is satisfied when the Commonwealth is able to show: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.[151]

As stated, the Commonwealth was able to produce the surveillance footage in question. Even if defense's best evidence objection was overruled in error, that error was harmless. Regardless of Officer Bialik's testimony regarding what he observed in the footage, the Commonwealth provided testimony from the victim, William Christopher Brown, who was able to describe the incident. This testimony included a description from the victim of the injuries he had sustained from

---

[148] *Commonwealth v. Lewis*, 424 Pa.Super. 531, 623 A.2d 355 (1993).
[149] *Id.*
[150] *Commonwealth v. Mitchell*, 576 Pa. 258, 280, 839 A.2d 202, 214 (2003).
[151] Commonwealth v. Green, 2017 PA Super 140, 162 A.3d 509, 519 (2017) (quoting *Commonwealth v. Passmore*, 867 A.2d 697, 711 (Pa.Super. 2004)).

Appellant as a result of Appellant's conduct. While the surveillance footage was evidence that would support that the Clark and Brown were on Freddie Turner's porch together, it was not the only evidence offered by the Commonwealth that established this fact. Furthermore, the Appellant was able to establish that he was on the porch with Brown, and the Appellant provided testimony confirming that he did strike Brown with a razor blade. Therefore, even if the objection to this line of questioning was incorrectly overruled, the testimony of the officer who viewed the footage in question was not dispositive of the Appellants guilt and amounts to harmless error.

### DR. CHRISTIE PROVIDED TESITMONY AS THE VICTIMS TREATING PHYSICIAN, NOT AN EXPERT WITNESS

Next, the Appellant claims that "[t]he Court erred in permitting the fact witness, Sabrina Christie, who was not qualified as an expert witness, to testify that a laceration that is 5 centimeters in depth is deep enough to pierce the 'platysma muscle.'"[152] The testimony in question involves Commonwealth witness Dr. Sabrina Christie (Dr. Christie), who testified as William Christopher Brown's treating physician.

Dr. Christie testified and referred to her operative dictation records for the victim during the course of his treatment.[153] Her testimony that a laceration that is 5 centimeters in depth is enough to pierce the platysma muscle was permitted, as

---

[152] Concise Statement of Errors Complained on Appeal, ¶8(q).
[153] *See* Commonwealth Exhibit 11.

she had personal knowledge of the injuries sustained by the victim and she was required to measure the wound in the course of his treatment. Her operative dictation records were not prepared in anticipation of litigation or for trial.

Our Superior Court has addressed issues regarding challenges to treating physician testimony on appeal. In *Krolikowski v. Ethicon Womens' Health & Urology a Div. of Eithicon, Inc.*, the court explained:

> Appellant's argument fails for several reasons. First, the *Polett* Court placed no emphasis on the fact that the treating physician was qualified as an expert at trial. Rather, the Court focused on the fact that the physician's causation opinion was formed during the course of treatment, rather than in anticipation of litigation. *See Polett*, 126 A.3d at 924-26. *See also Crespo*, 167 A.3d at 182 (concluding treating physician was "qualified to comment as a fact witness on causation because his testimony was based on his observations, diagnosis, and medical judgment at the time he rendered treatment to [the plaintiff];" question posed to physician asked him to clarify "his own notes").[154]

In another case, *Kurjan v. Anisman,* the Superior Court explained when testimony of a treating physician can survive an expert witness testimony challenge; specifically stating that opinions formed by a treating physician before litigation are admissible.[155] "Assuming *arguendo* that Dr. Hector's testimony is considered to be 'opinion' testimony, this testimony is still admissible as Dr. Hector was plaintiff's treating physician prior to and without any regard to litigation."

[154] *Krolikowski v. Ethicon Womens' Health & Urology a Div. of Ethicon, Inc.*, 240 A.3d 151 (Pa. Super. Ct. 2020)
[155] *Kurjan v. Anisman,* 851 A.2d 152, 156 (Pa.Super.2004)

In another challenge to physician testimony on appeal, the Superior

Court differentiated between expert medical testimony and opinion

testimony of a treating physical.

> Appellant first alleges that because Dr. Channapati testified as a
> medical expert, he was required to provide a pre-trial report pursuant
> to Pa.R.C.P. 4003.5. Therefore, Appellant argues that because Dr.
> Channapati did not provide a pre-trial report, the trial court should
> have precluded his testimony. The trial court found that Dr.
> Channapati was not required to provide a pre-trial report pursuant to
> Rule 4003.5 **because he was not retained in anticipation of
> litigation.** We agree. This Court has held that where a doctor's
> opinions and knowledge are acquired before an action commences,
> the doctor's "opinions proffered at trial fall outside the scope of Rule
> 4003.5." *Katz v. St. Mary's Hospital,* 816 A.2d 1125, 1127
> (Pa.Super.2003). Presently, Dr. Channapati was the decedent's treating
> physician. His testimony related to his personal observations of the
> decedent in the months prior to her death. He testified regarding her
> condition and the care he provided to her. Dr. Channapati did not
> express any opinion regarding whether Appellee was negligent or
> breached the standard of care required for a personal care home. Thus,
> it is clear that Dr. Channapati's testimony regarding the decedent's
> condition was not offered as expert medical opinion and that he was
> not retained by Appellee in anticipation of trial. Accordingly, the trial
> court did not err in finding Rule 4003.5 inapplicable.[156]

Similarly, Dr. Christie provided testimony regarding the victim's injuries as

related to her personal observations in the course of his treatment. A treating

physician's testimony is not subject to expert witness disclosure when the opinions

or facts are developed in the normal course of medical treatment for a patient and

are not developed in anticipation of litigation. As the treating physician who

---

[156] *Alwine v. Sugar Creek Rest, Inc.,* 2005 PA Super 291, ¶¶ 13-15, 883 A.2d 605, 610 (Pa. Super. Ct. 2005)

measured the depth of the injuries sustained by William Christopher Brown, she was permitted to testify whether or not an injury was deep enough to pierce the platysma muscle, as this knowledge was required for her to treat Brown's injury. This does not amount to expert testimony, as alleged by the Appellant, and the court was correct in ruling over defense counsel's objection on this matter.

## JURY INSTRUCTION REGARDING THE DEFINITION FOR DEADLY WEAPON UNDER THE STATUE NOT CONTAINED IN STANDARD CRIMINAL JURY INSTRUCTION

Finally, the Appellant argues that the trial court erred in providing a definition for deadly weapon under the statute, which was not contained in standard criminal jury instructions. Prior to jury instructions being provided, the court asked if there were any specific interrogatories being requested on the verdict slip. The Commonwealth requested a special interrogatory for deadly weapon to Count 1 and 2, over no objection from the defense counsel. This issue is related to a question posed by the jury during the course of deliberations, where they requested the statutory definition for "Deadly Weapon."

It's well-settled that suggested standard jury instructions themselves are not binding.[157] Suggested standard jury instructions do not alter the discretion afford to trial judges in crafting jury instructions; the instructions are guides only.[158] The trial courts of Pennsylvania "are invested with broad discretion in crafting jury

---

[157] *Commonwealth v. Simpson*, 620 Pa. 60, 95, 66 A.3d 253, 274 (2013).
[158] *Id.*

instructions, and such instructions will be upheld so long as they clearly and accurately present the law to the jury for its consideration."[159]

There is no doubt that the instructions read to the jury were a clear and accurate presentation of the law. In ruling on this matter, the court stated the following:

> I was aware of the notion, and it's been referred to as a well-settled principle that the standard jury instructions are not themselves binding, do not alter the discretion in me crafting jury instructions, and so given that that is the status of the law and given the clear authority that a trial judge may frame jury instructions and language that deviates from standard instructions, so long as the instruction adequately and accurately defines essential terms, so long as I abide by that polestar, I feel that giving the definition in Section 2301 is something that could very easily have been included in the original instruction and at this point it very well maybe if I have this instruction come up. It doesn't misstate the law or what a deadly weapon is. It doesn't confuse the jury by telling them that this is what it is. They have a specific question, and this is one of those times where it can definitely be answered with exact words. The question can be with, when I say exact words, I mean words straight from what they reference as Commonwealth law.
>
> So my intentions are to read the definition and tell them that this definition was not previously provided to them; however, this is the definition that arises out of Pennsylvania law, which is in something we call Title 18 in Section 2301. I don't like to give too may technical terms, but I think the reference to Pennsylvania law is necessary there.[160]

---

[159] *Commonwealth v. Rainey*, 593 Pa. 67, 112-13, 928 A.2d 215, 242-43 (2007).
[160] Transcript of Record, July 8, 2022, at 100-01, *Commonwealth of Pennsylvania v. Tyrone Clark*, 1651 of 2021.

The instruction read to the jury included the exact language under the statutory definition of deadly weapon. Providing this clarifying instruction to the jury was well within the discretion of the trial judge in this case.

## CONCLUSION

For the reasons stated above, this court respectfully submits that the allegations of error in this case are without merit and therefore this court's holding resulting from a deemed denial should be affirmed. The Beaver County Clerk of Courts is hereby directed to file the record of these proceedings with the Superior Court of Pennsylvania, an appropriate order shall follow.

Respectfully Submitted,

_____ J.

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

vs.

TYRONE CLARK

      :
      :      CP-04-CR-001651-2021
      :
      :      1412 WDA 2022
      :

## ORDER

**AND NOW,** this 30th day of January, 2023, it appearing that the defendant has filed a Notice of Appeal in the above-captioned case and it further appearing that the accompanying Memorandum Opinion satisfies the requirements of Pa. R.A.P. 1925(a), it is **ORDERED** that the Clerk of the Criminal Court Division of the Court of Common Pleas of Beaver County transmit the record in the above captioned case to the Superior Court forthwith.

BY THE COURT:

Mitchell P. Shahen, Judge

PENNSYLVANIA
BEAVER COUNTY

2023 JAN 30 PM 1:29

CLERK OF COURTS
JUDY R. ENSLEN